# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY INFORMATION CENTER
1718 Connecticut Avenue, N.W., Suite 200
Washington, D.C. 20009

    Plaintiff,

    v.

UNITED STATES DEPARTMENT OF COMMERCE,
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

BUREAU OF THE CENSUS,
4600 Silver Hill Road
Suitland, Md. 20746

    Defendants.

Civ. Action No. __18-2711____

## COMPLAINT FOR INJUNCTIVE RELIEF

1.      This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706; the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (codified as amended at 44 U.S.C. § 3501 note); and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to secure the creation and publication of multiple Privacy Impact Assessments ("PIAs") from the United States Department of Commerce and the Bureau of the Census.

2.      The Electronic Privacy Information Center ("EPIC") seeks the release of certain Privacy Impact Assessments pertaining to the Defendants' attempted collection of personal data concerning citizenship status by means of the 2020 Census.

**Jurisdiction and Venue**

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 5

U.S.C. § 702, and 5 U.S.C. § 704. This Court has personal jurisdiction over the Department of

Commerce and the Census Bureau.

4.      Venue is proper in this district under 5 U.S.C. § 703 and 28 U.S.C. § 1391.

**Parties**

5.      Plaintiff Electronic Privacy Information Center is a non-profit, public interest research

center established in 1994 to focus public attention on emerging privacy and civil liberties issues.

Central to EPIC's mission is oversight of government activities that impact individual privacy,

free expression, and democratic values.[1] EPIC has a particular interest in preserving legal

privacy protections for personal data, including those established in the E-Government Act.

6.      EPIC maintains one of the most popular privacy websites in the world, epic.org, which

provides the public with information about emerging privacy and civil liberties issues. EPIC also

provides a wide range of publications through the EPIC Bookstore.[2]

7.      EPIC has a robust open government practice and routinely disseminates to the public

information obtained under the Freedom of Information Act ("FOIA"), the E-Government Act,

and other federal and state transparency statutes. EPIC makes this information available through

the EPIC website, the biweekly EPIC Alert newsletter, and various news organizations.

8.      EPIC has brought numerous successful cases seeking the release of Privacy Impact

Assessments. In *EPIC v. DHS*, 926 F. Supp. 2d 311 (D.D.C. 2013), EPIC obtained a PIA and

related records concerning an effort by the Department of Homeland Security to track social

---

[1] *See* EPIC, *About EPIC* (2018), https://epic.org/epic/about.html**.**
[2] EPIC, *EPIC Bookstore* (2018), https://epic.org/bookstore/.

media users and journalists.[3] EPIC made the previously undisclosed documents available to the

public through the EPIC website. In *EPIC v. FBI*, 235 F. Supp. 3d 207 (D.D.C. 2017), EPIC

obtained unpublished PIAs from the Federal Bureau of Investigation concerning facial

recognition technology, which EPIC also made available to the public through the EPIC

website.[4] In *EPIC v. DEA*, 208 F. Supp. 3d 108 (D.D.C. 2016), EPIC learned that the Drug

Enforcement Administration had failed to produce PIAs for the agency's license plate reader

program, a telecommunications records database, and other systems of public surveillance.[5]

EPIC reported the agency's failure to produce a PIA through the EPIC website.[6] In *EPIC v.

Presidential Advisory Commission on Election Integrity*, 266 F. Supp. 3d 297 (D.D.C.), *aff'd on

other grounds*, 878 F.3d 371 (D.C. Cir. 2017), EPIC challenged the failure of the Presidential

Advisory Commission on Election Integrity to undertake and publish a PIA prior to the

collection of state voter data.[7] EPIC's suit led the Commission to suspend data collection,

discontinue the use of an unsafe computer server, and delete voter information that had been

illegally obtained.[8] And in *EPIC v. DHS*, No. 18-1268 (D.D.C. filed May 30, 2018), EPIC is

currently challenging the failure of the Department of Homeland Security to publish a PIA for a

system designed to track journalists, bloggers, and social media users.[9] EPIC's suit revealed that

---

[3] *See* EPIC, *EPIC v. Department of Homeland Security: Media Monitoring* (2015),
https://www.epic.org/foia/epic-v-dhs-media-monitoring/.
[4] *See* EPIC, *EPIC v. FBI – Privacy Assessments* (2016), https://epic.org/foia/fbi/pia/.
[5] *See* EPIC, *EPIC v. DEA – Privacy Impact Assessments* (2016), https://epic.org/foia/dea/pia/.
[6] *See id.*
[7] *See* EPIC, *EPIC v. Presidential Election Commission* (2018),
https://epic.org/privacy/litigation/voter/epic-v-commission/.
[8] *Id.*
[9] *See* EPIC, *EPIC v. DHS (Media Monitoring Services)* (2018), https://epic.org/foia/dhs/media-
monitoring-services/.

the DHS had unlawfully failed to conduct a PIA prior to developing the "Media Monitoring" system.[10]

9.      EPIC has long advocated for robust privacy protections for census respondents. EPIC was directly involved in the 2004 effort to revise the Census Bureau "sensitive data" policy after an EPIC FOIA lawsuit revealed that the DHS had acquired data on Arab Americans from the Census Bureau after 9/11.[11] In formal comments to the Census Bureau this year, EPIC opposed the decision to add a citizenship question to the 2020 census.[12] Through a recent FOIA request, EPIC also uncovered emails from Kansas Secretary of State Kris Kobach urging Commerce Secretary Wilbur Ross, on the direction of Chief White House Strategist Steve Bannon, to add a citizenship question to the 2020 Census.[13]

10.      EPIC is a dues-paying membership organization, as set forth in the EPIC Articles of Incorporation[14] and the EPIC Bylaws.[15] EPIC is governed by a Board of Directors, all of whom "must be Members of" EPIC.[16]

---

[10] *Id.*

[11] EPIC, *Department of Homeland Security Obtained Data on Arab Americans From Census Bureau* (2004), https://epic.org/privacy/census/foia/.

[12] See EPIC, *Comments of the Electronic Privacy Information Center to the U.S. Census Bureau: 2020 Census* (Aug. 7, 2018), https://epic.org/apa/comments/EPIC-Census-2020-August2018.pdf.

[13] EPIC, *EPIC FOIA: EPIC Obtains Documents About Decision to Add Census Citizenship Question* (2018), https://epic.org/2018/06/epic-foia-epic-obtains-documen.html.

[14] EPIC, *Articles of Incorporation* (2018) ("The Corporation [EPIC] . . . may refer to people as 'members' pursuant to D.C. Code § 29-404.01, and the qualifications, rights, and privileges of such people shall be as set forth in the bylaws.").

[15] EPIC, *Bylaws of the Electronic Privacy Information Center* § 2.02 (as amended Jan. 26, 2018), https://epic.org/epic/bylaws.pdf [hereinafter "*EPIC Bylaws*"].

[16] *EPIC Bylaws* § 2.02.

11.     EPIC's Members are "distinguished experts in law, technology, and public policy."[17] New Members are designated by EPIC following "nomination by the current Members and a vote of the Board [of Directors.]"[18]

12.     Defendant United States Department of Commerce is a federal agency under 5 U.S.C. § 551(1) and 44 U.S.C. § 3502(1).[19] The Department of Commerce is headquartered in Washington, D.C.

13.     The Bureau of the Census is a federal agency under 5 U.S.C. § 551(1) and 44 U.S.C. § 3502(1).[20] The Census Bureau is an agency within the Department of Commerce and is headquartered in Suitland, Md.

## Facts

### The Defendants' Obligation to Conduct and Publish Privacy Impact Assessments

14.     Under section 208 of the E-Government Act, federal agencies—including the Department of Commerce and the Census Bureau—are required to "conduct," "ensure the review of," and "make . . . publicly available" a Privacy Impact Assessment <u>before</u> "initiating a new collection of information" that will be digitally stored or transmitted "in an identifiable form."[21] Information is in an identifiable form if it "permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means."[22] This includes "combination[s] of gender, race, birth date, geographic indicator, and other descriptors" that would permit

---

[17] *EPIC Bylaws* § 5.01.
[18] *Id.*
[19] *See* 15 U.S.C. § 1501 ("There shall be at the seat of government an executive department to be known as the Department of Commerce[.]").
[20] *See* 13 U.S.C. § 2 ("The Bureau is continued as an agency within, and under the jurisdiction of, the Department of Commerce.").
[21] E-Government Act § 208(b)(1).
[22] *Id.* § 208(d).

individuals to be uniquely identified, even in the absence of names, social security numbers, or other direct identifiers.[23]

15.     The Office of Budget and Management ("OMB"), which oversees enforcement of the E-Government Act government-wide, defines a PIA as:

> [A]n analysis of how information is handled: (i) to ensure handling conforms to applicable legal, regulatory, and policy requirements regarding privacy, (ii) to determine the risks and effects of collecting, maintaining and disseminating information in identifiable form in an electronic information system, and (iii) to examine and evaluate protections and alternative processes for handling information to mitigate potential privacy risks.[24]

16.     Section 208, in mandating that a PIA be conducted and published before an agency collects personally identifiable information, serves Congress's dual objectives of "mak[ing] the Federal Government more transparent and accountable," and "ensur[ing] sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government."[25]

17.     As the Census Bureau emphasizes in the Bureau's *Policy on Conducting Privacy Impact Assessments*, "PIAs are an important tool for assuring Census Bureau census and survey respondents, other agencies from whom we receive data, and the taxpayer, that the Census Bureau is minimizing privacy impacts and ensuring data confidentiality and security."[26]

18.     To satisfy section 208, a PIA must specify, *inter alia*, "what information is to be collected"; "why the information is being collected"; "the intended use [by] the agency of the

---

[23] Joshua B. Bolten, Dir., Office of Mgmt. & Budget, Executive Office of the President, M03-22, Memorandum for Heads of Executive Departments and Agencies, Attachment A § II.A.2 (Sept. 26, 2003), https://georgewbush-whitehouse.archives.gov/omb/memoranda/m03-22.html [hereinafter *OMB Guidance*].

[24] *OMB Guidance* § II.A.6.

[25] E-Government Act §§ 2(b)(9), 208(a).

[26] U.S. Census Bureau, *Policy on Conducting Privacy Impact Assessments* 2 (Nov. 16, 2005), https://www2.census.gov/foia/ds_policies/ds019.pdf [hereinafter *Census Bureau PIA Policy*].

information"; "with whom the information will be shared"; "what notice or opportunities for consent would be provided"; and "how the information will be secured."[27] Additionally, a PIA "must identify what choices the agency made regarding an IT system or collection of information as a result of performing the PIA."[28]

19.     A PIA must be "commensurate with the size of the information system being assessed, the sensitivity of information that is in an identifiable form in that system, and the risk of harm from unauthorized release of that information[.]"[29] As the OMB instructs, "The depth and content of the PIA should be appropriate for the nature of the information to be collected and the size and complexity of the IT system."[30]

20.     The OMB also underscores that "[a]gencies must consider the information 'life cycle' (i.e., collection, use, retention, processing, disclosure and destruction) in evaluating how information handling practices at each stage may affect individuals' privacy. To be comprehensive and meaningful, privacy impact assessments require collaboration by program experts as well as experts in the areas of information technology, IT security, records management and privacy."

21.     Where a PIA is required for a "major information system," the PIA should "reflect more extensive analyses of: 1. the consequences of collection and flow of information, 2. the alternatives to collection and handling as designed, 3. the appropriate measures to mitigate risks identified for each alternative and, 4. the rationale for the final design choice or business process."[31] A "major information system" includes any "system or project that requires special

---

[27] E-Government Act § 208(b)(2)(B)(ii).
[28] *OMB Guidance* § II.C.1.b.
[29] E-Government Act § 208(b)(2)(B)(i).
[30] *OMB Guidance* § II.C.2.a.
[31] *OMB Guidance* § II.C.2.a.ii.

management attention because of its: (i) importance to the agency mission, (ii) high

development, operating and maintenance costs, (iii) high risk, (iv) high return, (v) significant

role in the administration of an agency's programs, finances, property or other resources."[32] In

these circumstances, a mere "checklist or template" will not satisfy an agency's PIA obligation.[33]

22.     The Census Bureau further mandates that a PIA "cover the risks and effects of collecting,

maintaining, and disseminating information in identifiable form in an electronic information

system. A PIA must evaluate the protections and alternative processes for handling information

to mitigate potential privacy risks."[34]

23.     According to the OMB, "Agencies should commence a PIA when they begin to develop a

new or significantly modified [information technology] system or information collection[.]"[35]

Thus, when an agency intends to "develop[] . . . projects that collect, maintain or disseminate

information in identifiable form from or about members of the public," the agency must first

conduct a PIA.[36]

24.     But an agency's privacy obligations under the E-Government Act do not end with the

initial publication of a Privacy Impact Assessment. Rather, a PIA must be revised continually "to

reflect changed information collection authorities, business processes or other factors affecting

the collection and handling of information in identifiable form."[37] Specifically, a PIA must be

"updated as necessary where a system change creates new privacy risks," including "when new

---

[32] *OMB Guidance* § II.A.4.
[33] *OMB Guidance* § II.C.2.a.iii.
[34] *Census Bureau PIA Policy* 2.
[35] *OMB Guidance* § II.C.2 (emphasis added).
[36] *OMB Guidance* § II.B.1.a.
[37] *OMB Guidance* § II.B.4; *accord* U.S. Dep't of Commerce, Office of Privacy & Open Gov't, *Privacy Compliance* (July 9, 2018), http://www.osec.doc.gov/opog/privacy/compliance.html [hereinafter *Commerce Dep't Privacy Compliance*]; *Census Bureau PIA Policy* 2.

information in identifiable form added to a collection raises the risks to personal privacy (for example, the addition of health or financial information)"; "when agencies work together on shared functions involving significant new uses or exchanges of information in identifiable form"; and "when agencies adopt or alter business processes so that government databases holding information in identifiable form are merged, centralized, matched with other databases or otherwise significantly manipulated."[38]

25.    Compliance with section 208 is an essential step to fulfilling the *U.S. Census Bureau Privacy Principles*.[39] Under those principles, the Census Bureau has committed to "only collect information that is necessary for meeting the Census Bureau's mission and legal requirements"; to "be open about its programs, policies and practices to collect and protect identifiable data used to produce statistical information"; to "make it easy to access information about what [the Bureau] collect[s] and why"; and to "be considerate of respondents' time and desire for privacy."[40]

**The Defendants' Collection of Personal Data Concerning Citizenship Status**

26.    In order to determine the apportionment of representatives "among the several States," the Census Clause of the U.S. Constitution, as amended, requires that an "actual Enumeration" of persons be undertaken every ten years "in such Manner as [Congress] shall by Law direct."[41]

---

[38] *OMB Guidance* §§ II.B.2.d, g, i; *accord Commerce Dep't Privacy Compliance*.
[39] U.S. Census Bureau, *U.S. Census Bureau Privacy Principles* (2006), https://www2.census.gov/foia/ds_policies/ds0pp.pdf.
[40] *Id.* at 1–2.
[41] U.S. Const. art. 1, § 2, cl. 3; *see also* U.S. Const. amend. XIV, § 2 ("Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.").

27.     In furtherance of the Census Clause, Congress has directed the Secretary of Commerce to "take a decennial census of population"[42] and to "determine the inquiries, and the number, form, and subdivisions" of the questionnaires to be used in the Census.

28.     Congress has also established the Census Bureau as an agency under the Department of Commerce.[43] The Census Bureau will administer the next Census in 2020.[44]

29.     By law, any person who refuses to answer "any of the questions . . . submitted to him in connection with any census"—or who willfully gives a false answer to a census question—is subject to criminal penalties.[45]

30.     On March 26, 2018, Secretary of Commerce Wilbur Ross disclosed in an intra-agency letter that he "ha[d] determined that reinstatement of a citizenship question on the 2020 decennial census [wa]s necessary" and that he was "directing the Census Bureau to place the citizenship question last on the decennial census form."[46] No such question appeared on the 2010 Census,[47] nor has the Census Bureau posed a citizenship question to all census respondents since the 1950 Census.[48]

---

[42] 13 U.S.C. § 141(a).

[43] 15 U.S.C. § 1501.

[44] *See* U.S. Census Bureau, *2020 Census* (Oct. 19, 2018), https://www.census.gov/programs-surveys/decennial-census/2020-census.html.

[45] 13 U.S.C. § 221(a)–(b).

[46] Letter from Wilbur Ross, Secretary of Commerce, to Karen Dunn Kelley, Under Secretary for Economic Affairs, at 8 (March 26, 2018), *available at* https://www.scribd.com/document/374971353/Reinstatement-of-a-Citizenship-Question-on-the-2020-Decennial-Census-Questionnaire [hereinafter Ross Letter].

[47] U.S. Census Bureau, *History: 2010* (July 18, 2017), https://www.census.gov/history/www/through_the_decades/index_of_questions/2010.html.

[48] Tamara Keith, *FACT CHECK: Has Citizenship Been A Standard Census Question?*, NPR (Mar. 27, 2018), https://www.npr.org/2018/03/27/597436512/fact-check-has-citizenship-been-a-standard-census-question.

31.     Secretary Ross stated that the decision to add the citizenship question was in response to

a December 2017 request by the Department of Justice ("DOJ"),[49] which purportedly sought

citizenship data to enable "more effective enforcement" of the Voting Rights Act.[50] The DOJ's

request raised alarm and opposition from members of the U.S. Senate,[51] the attorneys general of

at least twenty states,[52] and numerous mayors from across the country.[53] Moreover, Secretary

Ross's explanation for his decision is at odds with his subsequent statement that he

communicated with Chief White House strategist Steve Bannon and Kansas Secretary of State

Kris Kobach about the citizenship question months before the DOJ made a request.[54]

---

[49] Letter from Arthur E. Gary, Gen. Counsel, Justice Mgmt. Div., Dep't of Justice, to Ron Jamin, U.S. Census Bureau (Dec. 12, 2017), *available at* https://www.documentcloud.org/documents/4340651-Text-of-Dec-2017-DOJ-letter-to-Census.html [hereinafter DOJ Letter].

[50] Ross Letter at 1.

[51] Letter from Sen. Dianne Feinstein et al. to Wilbur Ross, Secretary of Commerce (Jan. 5, 2018), https://www.feinstein.senate.gov/public/_cache/files/3/7/376f8dcd-7f35-4913-9e80-cd1e48e3b312/7E4C59B2988E2CC14866543EDD7E01A6.2018.01.05-census-citizenship-letter.pdf.

[52] Letter from Attorneys General of Twenty U.S. States to Wilbur Ross, Secretary of Commerce (Feb. 12, 2018), *available at* https://www.brennancenter.org/sites/default/files/legal-work/Multi-State-Attorney-General-Letter-re-2020-Census.pdf.

[53] U.S. Conference of Mayors, *Nation's Mayors to Secretary Ross: Don't Politicize Census. Remove the Citizenship Question* (Mar. 27, 2018), https://www.usmayors.org/2018/03/27/nations-mayors-to-secretary-ross-dont-politicize-census-remove-the-citizenship-question/.

[54] Defs.' Second Suppl. Resps. to Pls.' First Set of Interrogatories 2–3, *N.Y. Immigration Coal. v. U.S. Dep't of Commerce,* 18-5025 (Oct. 11, 2018), *available at* https://ag.ny.gov/sites/default/files/second_supp_res_to_rog_1_final_2018.10.11.pdf; *see also* Email from Kris Kobach, Sec'y, Kan. Dep't of State, to Wilbur Ross, Sec'y, Dep't of Commerce (Jul. 21, 2017), https://epic.org/foia/censusbureau/EPIC-18-03-22-Census-Bureau-FOIA-20180611-Production-Kobach-Emails.pdf.

32.     On March 28, 2018, the Census Bureau reported to Congress the Bureau's intention to

add a citizenship question to the 2020 Census.[55] The question was drafted as follows:[56]



33.     The Census Bureau reported to Congress that the "question about a person's citizenship

[would be] used to create statistics about citizen and noncitizen populations" and stated that

"[t]hese statistics are essential for enforcing the Voting Rights Act and its protections against

voting discrimination."[57]

34.     The Bureau falsely implied that a citizenship question has been continuously asked on the

census since 1890,[58] when in fact it has been nearly 70 years since the Bureau asked for the

citizenship status of all census respondents.[59] As the Pew Research Center states plainly, "[f]or

---

[55] U.S. Census Bureau, *Questions Planned for the 2020 Census and American Community Survey* 7 (March 2018),
https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf.

[56] *Id.*

[57] *Id.* (capitalization altered).

[58] *Id.* at 7 n.1 ("Citizenship asked 1820, 1830, 1870, and 1890 to present.").

[59] *See* Catherine E. Shoichet, *Why putting a citizenship question on the census is a big deal*, CNN (Mar. 28, 2018), https://www.cnn.com/2018/03/27/politics/census-citizenship-question-explainer/index.html.

the first time since 1950, the U.S. Census Bureau is planning to ask everyone living in the United

States whether they are citizens when it conducts its next decennial census in 2020."[60]

**The Privacy Implications of Collecting Personal Data Concerning Citizenship Status**

35.     As the Supreme Court recognized in *Baldrige v. Shapiro*: "Although Congress has broad

power to require individuals to submit responses, an accurate census depends in large part on

public cooperation. To stimulate that cooperation Congress has provided assurances that

information furnished . . . by individuals is to be treated as confidential."[61]

36.     The Census Bureau's collection of personally identifiable information carries inherent

privacy risks, but the addition of a citizenship question on the 2020 Census presents unique

threats to privacy, personal security, and the accuracy of the United States Census.

37.     The citizenship question would compel the release of respondents' citizenship and

immigration status, potentially exposing individuals and their family members to investigation,

sanction, and deportation.[62]

38.     Indeed, Secretary Ross's stated basis for adding the citizenship question was to provide

the DOJ with "census block level citizen voting age population ("CVAP") data."[63] The DOJ has

also called on the Bureau to publicly "release this new data regarding citizenship at the same

time it releases the other redistricting data[.]"[64]

39.     Moreover, the most recent Privacy Impact Assessment for CEN08—a key Census Bureau

division which "process[es] response data from census tests and 2020 Census operations"—

---

[60] D'Vera Cohen, *What to Know About the Citizenship Question the Census Bureau is Planning to Ask in 2020*, Pew Research Center (Mar. 30, 2018).
[61] *Baldrige v. Shapiro*, 455 U.S. 345, 354 (1982).
[62] U.S. Dep't of Commerce, U.S. Census Bureau, *QuickFacts* (2017), https://www.census.gov/quickfacts/fact/table/US/AGE775217.
[63] Ross Letter at 1; *see also* DOJ Letter at 1.
[64] DOJ Letter at 3.

states, for the first time, that the Bureau is "collecting, maintaining, or disseminating" personally

identifiable information through CEN08 "[f]or criminal law enforcement activities":[65]

> 4.1   Indicate why the PII/BII in the IT system is being collected, maintained, or disseminated.
> *(Check all that apply.)*

| Purpose | | |
|---|---|---|
| For a Computer Matching Program | For administering human resources programs | x |
| For administrative matters | To promote information sharing initiatives | |
| For litigation | For criminal law enforcement activities | x |
| For civil enforcement activities | For intelligence activities | |
| To improve Federal services online | For employee or customer satisfaction | |
| For web measurement and customization technologies (single-session ) | For web measurement and customization technologies (multi-session ) | |
| Other (specify):  For Statistical Purposes (i.e. Censuses/Surveys) | | |

The CEN08 PIA specifically notes that "[c]itizenship" status is among the "personally

identifiable information . . . collected, maintained, or disseminated" by CEN08 (though the PIA

fails completely to assess the privacy implications of handling that data):[66]

| General Personal Data (GPD) | | | | | | | |
|---|---|---|---|---|---|---|---|
| a.  Name | x | g.  Date of Birth | x | m.  Religion | | | |
| b.  Maiden Name | | h.  Place of Birth | | n.  Financial Information | | | |
| c.  Alias | | i.  Home Address | x | o.  Medical Information | | | |
| d.  Gender | x | j.  Telephone Number | x | p.  Military Service | | | |
| e.  Age | x | k.  Email Address | x | q.  Physical Characteristics | | | |
| f.  Race/Ethnicity | x | l.  Education | x | r.  Mother's Maiden Name | | | |
| s.  Other general personal data (specify): Citizenship | | | | | | | |

40.     This admission in the CEN08 PIA is consistent with a June 12, 2018 email exchange

between Department of Justice officials, disclosed in the course of litigation against Secretary

Ross,[67] in which the officials "privately discussed the possibility that in the future census

information could be shared with law enforcement."[68]

---

[65] U.S. Dep't of Commerce, *Privacy Impact Assessment for the CEN08 Decennial Information Technology Division (DITD)* 1, 7 (approved Sep. 28, 2018), http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN08_PIA_SAOP_Approved.pdf.
[66] *Id.* at 5.
[67] Decl. of Andrew Case in Supp. of Pls.' Opp'n to Defs.' Mot. Summ. J. at Ex. B, *San Jose v. Ross*, 18-2279 (N.D. Cal. Filed Nov. 16, 2018), *available at* https://assets.documentcloud.org/documents/5193403/Nov-16-2018-Declaration-of-Andrew-Case-in.pdf.
[68] Tara Bahrampour, *Trump administration officials suggested sharing census responses with law enforcement, court documents show*, Wash. Post (Nov. 19, 2018), https://www.washingtonpost.com/local/social-issues/trump-administration-officials-suggested-

41.     Transmitting personal data concerning citizenship status to the Department of Justice or other law enforcement agencies would violate the Bureau's statutory obligation not to disclose "personally identifiable information about an individual to any other individual or agency until 72 years after it was collected for the decennial census."[69]

42.     Even if citizenship data were "deidentified" before dissemination, there is a material risk of reidentification. As Dr. Latanya Sweeney has demonstrated, the "practice of de-identifying data and of ad hoc generalization" used by the Census Bureau is "not sufficient to render data anonymous because combinations of attributes often combine uniquely to re-identify individuals."[70] Using Census summary data and information from other readily available sources at the time, Dr. Sweeney "found that 87% . . . of the population in the United States had reported characteristics that likely made them unique based only on {5-digit ZIP, gender, date of birth}."[71] Recent work by the National Academies of Sciences suggests that privacy-preserving techniques and privacy enhancing techniques could provide more robust approaches for deidentification, but the Census Bureau has given no indication that it will use such techniques with respect to personal data concerning citizenship status.[72]

---

sharing-census-responses-with-law-enforcement-court-documents-show/2018/11/19/41679018-ec46-11e8-8679-934a2b33be52_story.html.

[69] Pub. L. 94-416, 92 Stat. 915 (Oct. 5, 1978) (codified in relevant part at 44 U.S.C. § 2108); *see also* U.S. Dep't of Commerce, U.S. Census Bureau, *The "72-Year Rule"* (2018), https://www.census.gov/history/www/genealogy/decennial_census_records/the_72_year_rule_1.html.

[70] Latanya Sweeney, *Simple Demographics Often Identify People Uniquely* 2 (Carnegie Mellon Univ., Data Privacy Working Paper No. 3, 2000), https://dataprivacylab.org/projects/identifiability/paper1.pdf.

[71] *Id.*

[72] See Nat'l Academies of Sciences, Engineering, & Medicine, *Federal Statistics, Multiple Data Sources, and Privacy Protection: Next Steps* (2017), https://www.nap.edu/catalog/24893/federal-statistics-multiple-data-sources-and-privacy-protection-next-steps.

43.     Historically, the misuse of census data has caused grave harm to certain populations.[73]

For example, the 1910 census law prohibited the use of information supplied by businesses for

non-statistical, non-census purposes, but there was no such prohibition regarding individual

citizen data.[74] As a result, during World War I, the Census Bureau did in fact disclose census

records to the Department of Justice and local draft boards to help enforce the draft.[75] Similarly,

in 1920, the Department of Justice requested census data about individuals' citizenship for use in

deportation cases.[76]

44.     In 1930, Congress passed a census law that would become known as Title 13, which

prohibited the Census Bureau from publishing any data identifying individuals.[77] However, the

Second War Powers Act weakened this restriction and permitted the Census Bureau in 1943 to

provide the U.S. Secret Service with the names, addresses, occupations, and citizenship status of

every Japanese American residing in the Washington, D.C. area.[78] The Census Bureau also

provided the War Department with census-block level data on Japanese Americans residing in

western states to facilitate their internment.[79]

45.     In 2004, an EPIC FOIA lawsuit revealed that the Census Bureau had provided the

Department of Homeland Security with a list of cities containing more than 1,000 Arab-

---

[73] *See, e.g.,* Lutz. K. Berkner, *Review: The Use and Misuse of Census Data for the Historical Analysis of Family Structure*, 5 J. Interdisciplinary Hist. 721 (1975).
[74] Act of Jul. 2, 1909 (to provide for the expenses of the Thirteenth December Census, and for other purposes), ch. 2, § 25, 36 Stat. 1, 9.
[75] Margo Anderson & William Seltzer, *Challenges to the Confidentiality of U.S. Federal Statistics*, 1910-1965, 23 J Official Stat. 1, 6–7 (2007).
[76] *Id.* at 8–9.
[77] Act of Jun. 18, 1929 (to provide for the fifteenth and subsequent decennial censuses and to provide for apportionment of Representatives in Congress), ch. 28, § 11, 46 Stat. 21, 25.
[78] Margo Anderson & William Seltzer, *Census Confidentiality Under the Second War Powers Act (1942- 1947)* at 16 (Mar. 29-31, 2007) (unpublished manuscript).
[79] Comm'n on Wartime Relocation and Internment of Civilians, *Personal Justice Denied* 104-05 (1982).

American residents and a zip-code level breakdown of Arab-American populations throughout the United States, sorted by country of origin.[80] While the Census Bureau and Customs and Border Protection revised their data request policies following EPIC's FOIA case,[81] many Americans are justifiably fearful that their census responses will be used against them by other federal agencies, which can lead individuals to provide false or incomplete information.

46.     The disclosure of personal data collected for census tabulation to other agencies for other purposes also threatens to undermine the integrity and accuracy of the census. In a 2018 report, the Census Bureau concluded that adding a citizenship question is "very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available" from other government sources.[82]

### The Defendants' Failure to Assess the Privacy Impact of Collecting Personal Data Concerning Citizenship Status

47.     The Department of Commerce and the Census Bureau have failed to conduct a legally sufficient—or in some cases, *any*—Privacy Impact Assessment for the collection, processing,

---

[80] EPIC, *Department of Homeland Security Obtained Data on Arab Americans From Census Bureau* (2004), https://epic.org/privacy/census/foia/; *see also* Lynette Clemetson, *Homeland Security Given Data on Arab-Americans*, N.Y. Times (Jul. 30, 2004).

[81] U.S. Customs and Border Protection, *Policy for Requesting Information of a Sensitive Nature from the Census Bureau* (Aug. 9, 2004), https://epic.org/privacy/census/foia/policy.pdf; Census Bureau News, *U.S. Census Bureau Announces Policy Regarding Sensitive Data*, press release CB04-145, August 30, 2004; Lynette Clemetson, *Census Policy On Providing Sensitive Data Is Revised*, N.Y. Times, (Aug. 31, 2004), http://www.nytimes.com/2004/08/31/us/census-policy-on-providing-sensitive-data-is-revised.html; Mikelyn Meyers, Center for Survey Management, U.S. Census Bureau, *Presentation on Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for the 2020 Census*, presented at National Advisory Committee on Racial, Ethnic, and Other Populations Fall Meeting (Nov. 2, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Meyers-NAC-Confidentiality-Presentation.pdf.

[82] U.S. Dep't of Commerce, U.S. Census Bureau, *Technical Review of the Dep't of Justice Request to Add Citizenship Question to the 2020 Census* (Jan. 19, 2018), *available at* https://epic.org/foia/censusbureau/EPIC-18-03-22-Census-Bureau-FOIA-20180611-Production-Technical-Review-Memo.pdf.

and storage of citizenship information by the various Bureau systems that handle personally identifiable census data.

48.     When the Department of Commerce and the Census Bureau produce a PIA concerning Bureau activities, the PIA is published on a webpage titled *U.S. Census Bureau Privacy Impact Assessments (PIAs) and Privacy Threshold Analysis (PTA)*.[83] The webpage lists Census Bureau systems and divisions that collect, process, and/or store personally identifiable information.[84] The page also provides links to (1) the most recent Privacy Impact Assessment for each system, and (2) the most recent Privacy Threshold Analysis for each system.[85]

49.     At least five of the CEN systems and divisions identified on the Census Bureau's PIA webpage (CEN05, CEN08, CEN11, CEN13, and CEN18) will be used to collect, process, and/or store personally identifiable information obtained through the 2020 Census, including citizenship data.

50.     The decision to collect personal data concerning citizenship status triggers the Bureau's obligation to update and publish the Privacy Impact Assessment for each of these five CENs. This is so for six reasons: (1) the Bureau is creating "a new collection of information" that will be digitally stored or transmitted "in an identifiable form";[86] (2) the introduction of citizenship data is a "factor[] affecting the collection and handling of information in identifiable form";[87] (3) the introduction of citizenship data is a change to a system that "creates new privacy risks";[88] (4)

---

[83] Dep't of Commerce, Office of Privacy & Open Gov't, *U.S. Census Bureau Privacy Impact Assessments (PIAs) and Privacy Threshold Analysis (PTA)*, (Oct. 1, 2018), http://www.osec.doc.gov/opog/privacy/Census-pias.html.
[84] *See id.*
[85] *See id.*
[86] E-Government Act § 208(b)(1).
[87] *OMB Guidance* § II.B.4.
[88] *Id.* § II.B.2.

the Bureau is introducing "new information in identifiable form to a collection [that] raises the risks to personal privacy" (similar to "health or financial information");[89] (5) the Bureau's plans for the data include "significant new uses or exchanges of information in identifiable form";[90] and (6) the Bureau is newly "merg[ing], centraliz[ing], [and] match[ing]" citizenship data with data in "other databases[.]"[91] Each these conditions independently requires the publication or republication of a fully compliant PIA.

51.     The Defendants' obligation to conduct a PIA for each of the five CENs is already ripe, as the Bureau has "beg[u]n to develop a new or significantly modified [information technology] system or information collection[.]"[92]

52.     EPIC, by itself and on behalf of its Members, sought out the full and complete Privacy Impact Assessment that the Defendants must publish under section 208 of the E-Government Act for each of the five CENs, including all of the information and analysis mandated by section 208(b)(2)(B)(ii), by the *OMB Guidance*, by the *Commerce Department Privacy Compliance* guidelines, and by the Census *Bureau PIA Policy*. Although a recent PIA exists for each CEN, three of the five fail to mention citizenship data at all, while the other two include zero analysis of how the collection of personal data concerning citizenship status would affect the privacy of census respondents. EPIC, by itself and on behalf of its Members, was unable to obtain—and was thereby denied—the information that it sought about each CEN and about the collection of personal data concerning citizenship status.

---

[89] *Id.* § II.B.2.i.
[90] *Id.* § II.B.2.g.
[91] *Id.* § II.B.2.d.
[92] *Id.* § II.C.2.

53.     EPIC, by itself and on behalf of its Members, sought out the full and complete Privacy

Impact Assessment required for "CEN05 Field Systems Major Application" by visiting the

Census Bureau PIA webpage.[93] CEN05 is a "major information system" that "plans, organizes,

coordinates, and carries out the Census Bureau's field data collection program for sample

surveys, special censuses, the Economic Census, and the Decennial census."[94] As such, the

system is slated to collect personal data concerning citizenship status for the 2020 Census.

54.     Nonetheless, the most recent PIA for CEN05 fails to even acknowledge that the system

would handle citizenship information, let alone analyze the privacy impact of that data

collection.[95] As a result, EPIC, by itself and on behalf of its Members, was unable to obtain—and

was thereby denied—information concerning CEN05 to which EPIC is legally entitled under the

E-Government Act and implementing authorities.

55.     EPIC, by itself and on behalf of its Members, also sought the full and complete Privacy

Impact Assessment required for "CEN08 Decennial Information Technology Division (DITD)"

by visiting the Census Bureau PIA webpage.[96] CEN08 is a Census Bureau division and major

information system "consist[ing] of both general support systems and major applications,"

including applications that "process response data from census tests and 2020 Census

operations[.]"[97] As such, the system is slated to process personal data concerning citizenship

status from the 2020 Census.

---

[93] U.S. Dep't of Commerce, *Privacy Impact Assessment for the CEN05 Field Systems Major Application System* (approved June 22, 2018),
http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN05_PIA_SAOP_Approved.pdf.
[94] *Id.* at 1.
[95] *See generally id.*
[96] U.S. Dep't of Commerce, *Privacy Impact Assessment for the CEN08 Decennial Information Technology Division (DITD)* (approved Sep. 28, 2018),
http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN08_PIA_SAOP_Approved.pdf.
[97] *Id.* at 1.

56.     Although the most recent PIA for CEN08 acknowledges the existence of the citizenship question through a single word ("Citizenship"),[98] the PIA entirely fails to analyze the implications of collecting this unique form of data.[99] The Bureau's one-word modification of a previous PIA, following the decision to add the most controversial question on the 2020 Census, is utterly inadequate and violates the Bureau's obligation to produce a PIA that is "commensurate with the size of the information system being assessed, the sensitivity of information that is in an identifiable form in that system, and the risk of harm from unauthorized release of that information[.]"[100] As a result, EPIC, by itself and on behalf of its Members, was unable to obtain—and was thereby denied—information concerning CEN08 to which EPIC is legally entitled under the E-Government Act and implementing authorities.

57.     EPIC, by itself and on behalf of its Members, also sought the full and complete Privacy Impact Assessment required for "CEN11 Demographic Census, Surveys, and Special Processing" by visiting the Census Bureau PIA webpage.[101] CEN11 is a major information system "comprised of components that support the Demographic Directorate business functions" and includes "a Commercial off the Shelf (COTS) product used by Census Bureau demographic programs for data access, transformation, reporting, and statistical analysis."[102] As such, the system is slated to process personal data concerning citizenship status from the 2020 Census.

---

[98] *Id.* at 5.

[99] *See generally id.* The first CEN08 PIA to acknowledge the existence of the citizenship question was approved earlier on June 26, 2018. U.S. Dep't of Commerce, *Privacy Impact Assessment for the CEN08 Decennial Information Technology Division (DITD)* (approved June 26, 2018). But neither the June 26 nor the current (September 28) version of the CEN08 PIA analyzes the implications of collecting personal data concerning citizenship status.

[100] E-Government Act § 208(b)(2)(B)(i).

[101] U.S. Dep't of Commerce, *Privacy Impact Assessment for the CEN11 Demographic Census, Surveys, and Special Processing* (approved June 22, 2018), http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN11_PIA_SAOP_Approved.pdf.

[102] *Id.* at 1.

58.     Although the most recent PIA for CEN08 acknowledges the existence of the citizenship question through a single word ("Citizenship"),[103] the PIA entirely fails to analyze the implications of collecting this unique form of data.[104] The Bureau's one-word modification of a previous PIA, following the decision to add the most controversial question on the 2020 Census, is utterly inadequate and violates the Bureau's obligation to produce a PIA that is "commensurate with the size of the information system being assessed, the sensitivity of information that is in an identifiable form in that system, and the risk of harm from unauthorized release of that information[.]"[105] As a result, EPIC, by itself and on behalf of its Members, was unable to obtain—and was thereby denied—information concerning CEN08 to which EPIC is legally entitled under the E-Government Act and implementing authorities.

59.     EPIC, by itself and on behalf of its Members, also sought out the full and complete Privacy Impact Assessment required for "CEN 13 Center for Economic Studies (CES)" by visiting the Census Bureau PIA webpage.[106] CEN13 is a major information system whose "data holdings include census and survey data which may contain name, gender, age, date of birth etc. from across the Census Bureau[.]"[107] As such, the system is slated to store personal data concerning citizenship status from the 2020 Census.

60.     Nonetheless, the most recent PIA for CEN13 fails to even acknowledge that the system would handle citizenship information, let alone analyze the privacy impact of storing that data.[108]

---

[103] *Id.* at 4.
[104] *See generally id.*
[105] E-Government Act § 208(b)(2)(B)(i).
[106] U.S. Dep't of Commerce, *Privacy Impact Assessment for the CEN 18 Enterprise Applications* (approved June 26, 2018),
http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN13_PIA_SAOP_Approved.pdf.
[107] *Id.* at 1.
[108] *See generally id.*

As a result, EPIC, by itself and on behalf of its Members, was unable to obtain—and was thereby denied—information concerning CEN13 to which EPIC is legally entitled under the E-Government Act and implementing authorities.

61.     EPIC, by itself and on behalf of its Members, also sought out the full and complete Privacy Impact Assessment required for "CEN 18 Enterprise Applications" by visiting the Census Bureau PIA webpage.[109] CEN18 is a major information system "used to deliver applications to end users of the U.S. Census Bureau network."[110] The system maintains "survey and census information," including "personal names, personal addresses, personal contact information (telephone numbers, email address), business information, occupation, medical information, tax information, etc."[111] As such, the system is slated to store personal data concerning citizenship status from the 2020 Census.

62.     Nonetheless, the most recent PIA for CEN18 fails to even acknowledge that the system would handle citizenship information, let alone analyze the privacy impact of storing that data.[112] As a result, EPIC, by itself and on behalf of its Members, was unable to obtain—and was thereby denied—information concerning CEN18 to which EPIC is legally entitled under the E-Government Act and implementing authorities.

63.     Though Secretary Ross's plan to add the citizenship question to the 2020 Census is arguably the most consequential decision in the Census Bureau's recent history, the Department

---

[109] U.S. Dep't of Commerce, *Privacy Impact Assessment for the CEN 13 Center for Economic Studies (CES)* (approved June 26, 2018),
http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN18_PIA_SAOP_Approved.pdf.
[110] *Id.* at 1.
[111] *Id.*
[112] *See generally id.*

of Commerce and the Bureau have failed to conduct *any* of the privacy analysis required by the E-Government Act for a major collection of personally identifiable information.

### Count I

**Violation of APA: Unlawful Agency Action**

64.     Plaintiff asserts and incorporates by reference paragraphs 1–63.

65.     By placing a citizenship question on the 2020 Census and initiating the process of collecting personal data concerning citizenship status, the Defendants have unlawfully begun to develop a new or significantly modified collection of information prior to creating, reviewing, and publishing the full and complete Privacy Impact Assessments required by section 208(b) of the E-Government Act of 2002.

66.     In violating section 208(b) the E-Government Act, Defendants have taken agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(a) and short of statutory right under 5 U.S.C. § 706(2)(c).

67.     Defendants' decision to collect personal data concerning citizenship status through the 2020 Census, Defendants' placement of a citizenship question on the 2020 Census, and Defendants' initiation of the citizenship data collection process are final agency actions within the meaning of 5 U.S.C. § 704.

68.     Plaintiff EPIC is adversely affected, aggrieved, and injured in fact by Defendants' actions. By beginning the process of collecting personal data concerning citizenship status without publishing the full and complete Privacy Impact Assessments required by section 208(b) of E-Government Act, Defendants have frustrated Plaintiff's longstanding mission to educate the public about the privacy implications of government databases that contain personally

identifiable information and—in particular—about the collection of personally identifiable information via the census.

69.     Plaintiff EPIC is also adversely affected, aggrieved, and injured in fact by Defendants' actions through EPIC's Members. EPIC's Members, most of whom reside in the United States, are required by law to respond to the citizenship question that will be imminently posed to them on the 2020 Census. 13 U.S.C. § 221(a)–(b). By beginning the process of collecting citizenship data without publishing the full and complete Privacy Impact Assessments required by section 208(b) of the E-Government Act, Defendants have unlawfully denied EPIC's Members—and by extension, EPIC—a full assessment of how their privacy interests will be affected <u>before</u> the collection process is initiated.

70.     Plaintiff has exhausted all applicable administrative remedies.

## <u>Count II</u>

### Violation of APA: Agency Action Unlawful Withheld

71.     Plaintiff asserts and incorporates by reference paragraphs 1–63.

72.     Defendants have failed to create, review, and publish the full and complete Privacy Impact Assessments required by section 208(b) of E-Government Act of 2002 for Defendants' decision to collect personal data concerning citizenship status through the 2020 Census, for Defendants' placement of a citizenship question on the 2020 Census, and for Defendants' initiation of the citizenship data collection process.

73.     In failing to take the steps required by section 208(b) of E-Government Act of 2002, Defendants have unlawfully withheld or unreasonably delayed agency action in violation of 5 U.S.C. § 706(1).

74.     Plaintiff EPIC is adversely affected, aggrieved, and injured in fact by Defendants'

inaction. By failing to publish the full and complete Privacy Impact Assessments required by

section 208(b) of the E-Government Act prior to beginning the process of collecting personal

data concerning citizenship status, Defendants have frustrated Plaintiff's longstanding mission to

educate the public about the privacy implications of government databases that contain

personally identifiable information and—in particular—about the collection of personally

identifiable information via the census.

75.     Plaintiff EPIC is also adversely affected, aggrieved, and injured in fact by Defendants'

actions through EPIC's Members. EPIC's Members, most of whom reside in the United States,

are required by law to respond to the citizenship question that will be imminently posed to them

on the 2020 Census. 13 U.S.C. § 221(a)–(b). By failing to publish the full and complete Privacy

Impact Assessments required by section 208(b) of the E-Government Act prior to beginning the

process of collecting citizenship data, Defendants have unlawfully denied EPIC's Members—

and by extension, EPIC—a full assessment of how their privacy interests will be affected <u>before</u>

the collection process is initiated.

76.     Plaintiff has exhausted all applicable administrative remedies.

### <u>Count III</u>

### Claim for Declaratory Relief

77.     Plaintiff asserts and incorporates by reference paragraphs 1–63.

78.     Plaintiff is entitled under 28 U.S.C. § 2201(a) to a declaration of the rights and other legal

relations of the parties with respect to the claims set forth in Counts I-II.

**Requested Relief**

WHEREFORE, Plaintiff requests this Court:

A.  Hold unlawful and set aside the Defendants' decision to collect citizenship data through the 2020 Census, Defendants' placement of a citizenship question on the 2020 Census, and Defendants' initiation of the citizenship data collection process;

B.  Order Defendants to suspend and revoke their decision collect citizenship data through the 2020 Census until the Defendants have conducted, reviewed, and published the full and complete Privacy Impact Assessments required by section 208(b) of E-Government Act of 2002;

C.  Order Defendants to revoke and remove the citizenship question from the 2020 Census until the Defendants have conducted, reviewed, and published the full and complete Privacy Impact Assessments required by section 208(b) of E-Government Act of 2002;

D.  Order Defendants to cease and desist from any action in furtherance of Defendants' plan to collect citizenship data through the 2020 Census until the Defendants have conducted, reviewed, and published the full and complete Privacy Impact Assessments required by section 208(b) of E-Government Act of 2002;

E.  Order Defendants to conduct, review, and publish the full and complete Privacy Impact Assessments required by section 208(b) of E-Government Act of 2002 for the Census Bureau's collection of citizenship data;

F.  Award EPIC costs and reasonable attorney's fees incurred in this action; and

G.  Grant such other relief as the Court may deem just and proper.

Respectfully Submitted,

MARC ROTENBERG, D.C. Bar #422825
EPIC President and Executive Director

ALAN BUTLER, D.C. Bar #1012128
EPIC Senior Counsel

 /s/  John Davisson
JOHN DAVISSON, D.C. Bar #1531914
EPIC Counsel

ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

Dated: November 20, 2018