# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY INFORMATION
CENTER,

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

      Defendants.

Civil Action No. 1:18-cv-02711 (DLF)

## DEFENDANTS' MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

I.      STATUTORY BACKGROUND ................................................................... 2

II.     FACTUAL BACKGROUND ......................................................................... 4

STANDARD OF REVIEW ....................................................................................... 7

ARGUMENT ............................................................................................................ 8

I.      PLAINTIFF HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS .................... 8

        1.      The Census Bureau Has Not "Initiated a New Collection of Information." ......... 10

        2.      Plaintiff is Not Likely To Show That its Claims Are Ripe or That it States
                a Claim Under the APA. ..................................................................... 16

II.     PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM. ........................ 21

III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH
        AGAINST INJUNCTIVE RELIEF. ............................................................... 26

CONCLUSION ......................................................................................................... 28

# TABLE OF AUTHORITIES

## CASES

*AARP v. U.S. EEOC*,
    226 F. Supp. 3d 7 (D.D.C. 2016) ........................................................................ 22

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ............................................................................................ 16

*Am. Petroleum Inst. v. EPA*,
    683 F.3d 382 (D.C. Cir. 2012) ............................................................................ 16

*Belmont Abbey Coll. v. Sebelius*,
    878 F. Supp. 2d 25 (D.D.C. 2012) ...................................................................... 16

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................................ 18

*Biovail Corp. v. U.S. Food & Drug Admin.*,
    448 F. Supp. 2d 154 (D.D.C. 2006) .................................................................... 22

*BP Am. Prod. Co. v. Burton*,
    549 U.S. 84 (2006) .............................................................................................. 10

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ........................................................................ 8, 21

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ............................................................................... 8

*Cobell v. Norton*,
    391 F.3d 251 (D.C. Cir. 2004) ............................................................................. 8

*Elec. Privacy Info. Ctr. v. Dep't of Justice*,
    15 F. Supp. 3d 32 (D.D.C. 2014) ........................................................................ 24

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017), *cert denied*,
    No. 18-267, 2019 WL 113530 (Jan. 7, 2019) .................................... 11, 20, 21, 27

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    266 F. Supp. 3d 297 (D.D.C. 2017), *aff'd on other grounds*,
    878 F.3d 371 (D.C. Cir. 2017) ............................................................................ 24

*Friends of Animals v. Jewell*,
    828 F.3d 989 (D.C. Cir. 2016) ............................................................................ 20

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975) .................................................................................. 22

*Hazardous Waste Treatment Council v. Reilly*,
    938 F.2d 1390 (D.C. Cir. 1991) ............................................................................... 19

*Her Majesty the Queen in Right of Ontario v. EPA*,
    912 F.2d 1525 (D.C. Cir. 1990) ............................................................................... 18

*In re Navy Chaplaincy*,
    534 F.3d 756 (D.C. Cir. 2008) ................................................................................. 21

*In re Navy Chaplaincy*,
    738 F.3d 425 (D.C. Cir. 2013) ................................................................................... 8

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
    933 F. Supp. 2d 58 (D.D.C. 2013) ....................................................................... 7, 8

*Jones v. District of Columbia Land Development Agency*,
    499 F.2d 502 (D.C. Cir. 1974) ................................................................................. 25

*Judicial Watch, Inc. v. Dep't of Homeland Sec.*,
    514 F. Supp. 2d 7 (D.D.C. 2007) ............................................................................ 24

*Kelso v. U.S. Dep't of* State,
    13 F. Supp. 2d 1 (D.D.C. 1998) .............................................................................. 10

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990) .................................................................................................. 19

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) ............................................................................ 22

*Navajo Nation v. Azar*,
    292 F. Supp. 3d 508 (D.D.C. 2018) ................................................................... 21, 26

*New York v. Dep't of Commerce*,
    No. 18-CV-5025 (JMF), 2019 WL 190285, (S.D.N.Y. Jan. 15, 2019) ................... 23

*Newdow v. Bush*,
    335 F. Supp. 2d 265 (D.D.C. 2005) ........................................................................ 21

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................... 8, 26

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004) .................................................................................................... 19

*Open Top Sightseeing USA v. Mr. Sightseeing, LCC*,
   48 F. Supp. 3d 87 (D.D.C. 2014) ................................................................ 21, 22

*Pharmaceutical Research & Manufacturers of America v. Thompson*,
   259 F. Supp. 2d 39 (D.D.C. 2003) ..................................................................... 20

*Sebelius v. Cloer*,
   569 U.S. 369 (2013) ............................................................................................ 10

*Sierra Club v. Thomas*,
   828 F.2d 783 (D.C. Cir. 1987), *partially abrogated by statute on other grounds*,
   *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) ............... 18

*Singh v. Carter*,
   185 F. Supp. 3d 11 (D.D.C. 2016) ....................................................................... 8

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ............................................................................ 17

*Vill. of Bensenville v. FAA*,
   376 F.3d 1114 (D.C. Cir. 2004) ........................................................................... 17

*Wash. Tennis & Educ. Found., Inc. v. Clark Nexsen, Inc.*,
   270 F. Supp. 3d 158 (D.D.C. 2017), *reconsideration denied*,
   324 F. Supp. 3d 128 (D.D.C. 2018) ..................................................................... 20

*\*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................... *passim*

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ...................................................................... 21, 26

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999) .............................................................................. 16

## STATUTES

5 U.S.C. § 551 .......................................................................................................... 18

5 U.S.C. § 552a .......................................................................................................... 3

5 U.S.C. § 704 .......................................................................................................... 18

5 U.S.C. § 706 ................................................................................................ 6, 17, 19

13 U.S.C. § 1 *et seq.* .................................................................................................. 4

13 U.S.C. § 2 ............................................................................................................... 4

13 U.S.C. § 4 ................................................................................................................. 4

13 U.S.C. § 5 ................................................................................................................. 4

13 U.S.C. § 141 ............................................................................................................. 4

13 U.S.C. § 221 ........................................................................................................... 14

44 U.S.C. § 3501 *et seq.* .............................................................................................. 2

44 U.S.C. § 3502 .......................................................................................... 3, 11, 13, 14

44 U.S.C. § 3506 .................................................................................................... 3, 14

44 U.S.C. § 3507 .................................................................................................... 3, 14

44 U.S.C. § 3512 ......................................................................................................... 14

The E-Government Act of 2002,
    Pub. L. 107-347, 116 Stat. 2899 (2002), *codified at* 44 U.S.C. § 3501 ............................ *passim*

**REGULATIONS**

5 C.F.R. § 1320.3 ................................................................................................ 12, 14, 15

5 C.F.R. § 1320.10 ....................................................................................................... 14

Dep't of Commerce, Proposed Information Collection; Comment Request; 2020 Census,
    83 Fed. Reg. 26,643 (June 8, 2018) ................................................................... 23, 24

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 2 .................................................................................................... 4

**OTHER AUTHORITIES**

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/initiate ................ 10

Office of Management & Budget, Circular No. A-130.,
    https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/OMB/circulars
    /a130/ a130revised.pdf ....................................................................................... 9, 19

U.S. Census Bureau, Archive of American Community Survey Questions,
    https://www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.html ........ 4

U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000
    https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf ................................. 4

U.S. Census Bureau, Questionnaires,
  https://www.census.gov/history/www/through_the_decades/questionnaires ............................ 4

## INTRODUCTION

The E-Government Act of 2002 requires that Federal agencies publish a Privacy Impact Assessment ("PIA"), if practicable, before "initiating a new collection of information." Plaintiff, the Electronic Privacy Information Center ("EPIC" or "Plaintiff") seeks a preliminary injunction against the Census Bureau and Department of Commerce ("Defendants"). It argues that the Census Bureau was required to publish a PIA addressing the inclusion of a citizenship question on the 2020 Decennial Census questionnaire as of March 26, 2018, the date that the Commerce Secretary announced his decision to include that question on the 2020 Decennial Census. But Plaintiff's motion is premature as the Census Bureau's obligation to complete, and if practicable, publish a PIA addressing the inclusion of a citizenship question on the 2020 Decennial Census has not yet ripened. Moreover, Plaintiff's delay in seeking preliminary relief demonstrates the absence of any urgency or irreparable harm. Accordingly, this Court should deny Plaintiff's request for the extraordinary remedy of preliminary injunctive relief.

First, Plaintiff's claims are not likely to succeed because they are premature. The obligation to complete and publish, if practicable, a PIA attaches only once the agency "initiat[es] a new collection of information." But Defendants have not yet initiated such a collection, which for these purposes, means having started obtaining or soliciting information from the public. Until they do, Defendants cannot have violated the E-Government Act. Moreover, notwithstanding the fact that they are not legally obligated to have completed the PIA process at this stage with respect to the citizenship question, Defendants have been updating and will continue to update PIAs for the relevant information technology systems and collections, and fully intend to comply with the Act before soliciting responses to the 2020 Decennial Census questionnaire. Second, even if the Court were to determine that Plaintiff's claims are not premature, Plaintiff's purported entitlement

1

to preliminary injunctive relief is untimely. This Circuit has made clear that an unexcused delay in seeking preliminary relief may be grounds for denial because it implies a lack of urgency and irreparable harm. Here, Plaintiff waited nearly eight months from the date of the alleged violation to seek preliminary relief, almost two months from the date it filed its Complaint, and three days after another Court vacated the Secretary's decision to reinstate the citizenship question on the 2020 Decennial Census. Such unexplained and unjustified delay is reason enough to deny Plaintiff's motion. In any event, Plaintiff fails to otherwise demonstrate irreparable harm or that the balance of equities and the public interest counsel in its member's favor.

## **BACKGROUND**

### I. **STATUTORY BACKGROUND**

The E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (2002), *codified at* 44 U.S.C. § 3501 note (hereinafter "E-Government Act" or "E-Gov. Act"), requires Federal agencies to have performed and, if practicable, publish a Privacy Impact Assessment ("PIA") when "developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form," or, consistent with the Paperwork Reduction Act, 44 U.S.C. § 3501, *et seq.*, when "initiating a new collection of information" that "will be collected, maintained, or disseminated using information technology" and "includes any information in an identifiable form permitting the physical or online contacting of a specific individual." E-Gov. Act, § 208(b)(1)(A)(i), (ii); *see also* Office of Management and Budget, Memorandum M-03-22, OMB Guidance for Implementing the Privacy Provisions of the E-Government Act. "The purpose of this [requirement] is to ensure sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government." E-Gov. Act, § 208(a).

Among other things, the PIA is to address "what information is to be collected," "why the information is being collected," "the intended use of the agency of the information," "with whom the information will be shared," "what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared," "how the information will be secured," and "whether a system of records is being created under" 5 U.S.C. § 552a (commonly referred to as the Privacy Act).   E-Gov. Act, § 208(b)(2)(B)(ii).   After completion of the PIA, and before "initiating a new collection of information," the agency is directed to, "if practicable, . . . make the privacy impact assessment publicly available through the website of the agency, publication in the *Federal Register*, or other means." *Id.* § 208(b)(1)(B)(iii).

The E-Government Act incorporates several provisions of the Paperwork Reduction Act, including the Act's definitions.   E-Gov. Act. § 201 ("Except as otherwise provided, in this title the definitions under sections 3502 and 3601 of title 44, United States Code, shall apply.").   The Paperwork Reduction Act, in turn, requires Federal agencies seeking to collect information to first publish a notice in the *Federal Register* and allow 60 days for submission of comments.   44 U.S.C. § 3506(c)(2)(A); *see also id.* § 3502(3) (defining "collection of information").   After considering the submitted comments, the agency must then submit its information collection request to the Director of the Office of Management and Budget ("OMB") for review.   *See id.* § 3507(c)(3).   The agency must also publish a second notice in the *Federal Register* to inform the public that the information collection request has been submitted to OMB and that additional comments may be directed to OMB.   *Id.* § 3507(a)(1)(D).   OMB must allow 30 days for public comment prior to approving or disapproving an information collection request.   *Id.* § 3507(b), (e)(1).

## II.     FACTUAL BACKGROUND

The Constitution requires that an "actual Enumeration" of the population be conducted every ten years in order to allocate representatives in Congress among the States, and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct." U.S. Const. art. I, § 2, cl. 3.  The Census Act, 13 U.S.C. § 1 *et seq.*, delegates to the Secretary of Commerce the responsibility to conduct the decennial census "in such form and content as he may determine," and "authorize[s] [him] to obtain such other census information as necessary." *Id.* § 141(a).  The Census Bureau assists the Secretary in performing this duty.  *See id.* §§ 2, 4.  The Act directs that the Secretary "shall prepare questionnaires, and shall determine the inquiries, and the number, form, and subdivisions thereof, for the statistics, surveys, and censuses provided for in this title."  13 U.S.C. § 5.  Nothing in the Act directs the contents of the questions included on the decennial census.

On March 26, 2018, the Secretary of Commerce announced his decision to include a citizenship question on the 2020 Decennial Census questionnaire.[1]  *See* Declaration of Robin J. Bachman, Chief Privacy Officer, United States Census Bureau ("Bachman Decl."), ¶ 10.  At the time of the announcement, pursuant to Section 208 of the E-Government Act, the Census Bureau

---

[1] With the exception of 1840, decennial censuses from 1820 to 1880 asked for citizenship or birthplace information in some form, and decennial censuses from 1890 through 1950 specifically requested citizenship information.  *See* U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000, at 6-13, https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf ("Measuring America").  Decennial censuses from 1960 to 2000 asked a portion of the population questions about the respondent's birthplace or citizenship. *Id.* at 72-73, 78, 91-92; U.S. Census Bureau, Questionnaires, https://www.census.gov/history/www/through_the_decades/questionnaires/.  Beginning in 2005, the Census Bureau began collecting citizenship information through the American Community Survey ("ACS"), which is sent yearly to about one in 38 households.  *See* U.S. Census Bureau, Archive of American Community Survey Questions, https://www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.html (noting citizenship questions on every ACS questionnaire).

was in the process of conducting its annual Privacy Impact Assessment of a primary information technology system used to administer the decennial census – CEN08.  *See* Bachman Decl. ¶¶ 3, 9, 10.  CEN08 is owned by the Decennial Information Technology Division (DITD) and is used to manage the development and implementation of a number of decennial census applications, including the Census Schedule A Human Resources Recruiting and Payroll Systems (C-SHaRPS), the Third-Party Fingerprinting System, and the Control and Response Data System (CaRDS).  *Id.* ¶ 3.  These applications contain several categories of information, including hiring and personnel data and data collected from decennial census respondents.  *Id.*  CEN08 shares information with several other of the Census Bureau's information technology systems, such as CEN21 (Human Resources Application), CEN05 (Field Systems Major Application System), CEN11 (Demographic Census, Surveys, and Special Processing), and CEN13 (Center for Economic Studies).  *Id.* ¶ 14.  CEN18 (Enterprise Applications) is the information technology system that facilitates the passing of information from CEN08 to these other information technology systems.  *Id.*  The Census Bureau updates its PIAs on a regular basis, and will continue to do so.  *See id.* ¶¶ 9, 15.

During the annual privacy review of CEN08, the Census Bureau updated the CEN08 PIA to reflect the Census Bureau's intent to include citizenship status among the personally identifying information ("PII") to be collected during the 2020 Decennial Census and its then assessment of the confidentiality risk level of collecting PII.  Bachman Decl. ¶ 10.  The updated PIA was published on Commerce and the Census Bureau's websites on June 26, 2018.  *Id.* ¶ 10 & Ex. A. The Census Bureau also updated the PIAs for CEN05, CEN11, CEN13, CEN18, and CEN21 during this time and likewise published the updated assessments on its website.  *See id.* ¶¶ 9, 15.

The Census Bureau further updated the PIA for CEN08 in July 2018 to reflect employment recruiting and hiring activities for the 2020 Decennial Census.  Bachman Decl. ¶ 13 & Ex. B. These updates focused on the collection of fingerprints and other personnel information during the application and hiring process for potential Census Bureau employees.  *Id.*  The updated PIA noted that the fingerprint and personnel information would be shared with other Federal agencies for the purposes of conducting background investigations and administering human resource programs, such as payroll.  *Id.*  The Census Bureau is currently in the process of updating the CEN08 PIA as it continues to refine its operations for the 2020 Decennial Census.  *See id.* ¶¶ 6, 9.  The PIAs for CEN05, CEN11, CEN13, and CEN18 are also currently under review to determine whether PIA updates are warranted.  *See id.* ¶ 15.

Decennial census respondent information collected through CEN08 and processed by or stored in other Census Bureau information technology systems, such as CEN05 and CEN11, is collected pursuant to the proscriptions of Title 13 of the United States Code, which requires that the Census Bureau maintain the confidentiality of the information it collects.  Bachman Decl. ¶ 14. Indeed, Title 13 mandates that the Census Bureau only use the respondent information it collects for statistical purposes and expressly prohibits the publication of identifying information and the use of collected information to a respondent's detriment.  *Id.* ¶¶ 14, 16.

Plaintiff filed this lawsuit on November 20, 2018.  It alleges that Defendants have violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1), 706(2)(a), (c), by failing to conduct and publish Privacy Impact Assessments addressing the collection of citizenship information for the information technology ("IT") systems that will be collecting, processing, and storing 2020 Decennial Census respondent information as required by Section 208 the E-Government.  *See* Compl. ¶¶ 47, 49, 53-62, 65, ECF No. 1.  Plaintiff seeks an order "suspend[ing]

and revok[ing]" Defendants' decision to collect citizenship data through the 2020 census until such time as Defendants have "conducted, reviewed, and published the full and complete Privacy Impact Assessments required by [the privacy provisions] of [the] E-Government Act of 2002." Compl., Request for Relief ¶ B. Plaintiff also seeks an order (1) expressly removing the citizenship question from the 2020 census, (2) enjoining Defendants from "any action in furtherance of Defendants' plan to collect citizenship data through the 2020 census until" they have completed and published the Privacy Impact Assessments required by the privacy provisions of the E-Government Act of 2002, and (3) requiring Defendants to conduct, review, and publish the full and complete Privacy Impact Assessments. *Id.* ¶¶ C-E.

Nearly two months later, on January 18, 2019, Plaintiff moved for a preliminary injunction asserting it is entitled to such extraordinary relief because "the Census Bureau's failure to publish legally required privacy impact assessments causes [it] irreparable harm and conflicts with the public interest." Mem. in Supp of Pl.'s Mot. for a Prelim Inj, at 15, ECF No. 8-1 ("Pl.'s Prelim. Inj. Mem"). Plaintiff seeks an order "preventing Defendants . . . from (1) implementing the [] March 26, 2018 decision to add a citizenship question to the 2020 Census, and (2) otherwise initiating any collection of citizenship status information that would be obtained through the 2020 Census" until final adjudication of the merits of its claims. Pl.'s Mot. for a Prelim. Inj., at 1, ECF No. 8. A hearing on Plaintiff's motion is currently scheduled for February 8, 2019.

## STANDARD OF REVIEW

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and

"should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).   A party moving for a temporary restraining order or a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).   When, as here, the government is opposing a motion for a preliminary injunction, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[2]

## ARGUMENT

## I.   PLAINTIFF HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS.

Section 208(b) of the E-Government Act, requires an agency to complete, and, if practicable, publish, a Privacy Impact Assessment ("PIA") before "initiating a new collection of information."   E-Gov. Act §§ 208(b)(1)(A)(ii), (b)(1)(B).   Plaintiff argues that the Census Bureau was required to have published this assessment as of March 26, 2018, the date that the Commerce Secretary "ordered the [reinstatement] of a citizenship question to the 2020 Census," because the Secretary's decision, it states, "initiat[ed] a new collection of citizenship status information."[3]

---

[2] "The D.C. Circuit has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions . . . . The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter v. National Resources Defense Council*, 555 U.S. 7, 22 (2008)." *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), for the proposition that all four prongs of the preliminary injunction standard must be met before injunctive relief can be granted).   In any event, regardless of which standard is applied, preliminary injunctive relief is inappropriate here.

[3] The E-Government Act also requires an agency to complete a PIA before "developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form."   E-Gov. Act § 208(b)(1)(A)(i).   Plaintiff's motion, however, only alleges

Pl.'s Prelim. Inj. Mem. at 19.  Plaintiff's claim utterly fails as a matter of statutory construction. The E-Government Act only requires that the Census Bureau complete and, if practicable, publish a PIA before initiating a new collection of information within the meaning of that Act – and because the Bureau has not yet started collecting citizenship information from the public for the 2020 Decennial Census, it has not violated the E-Government Act.  Accordingly, Plaintiff is not likely to succeed on the merits of its claims.

One initial note about terminology.  The E-Government Act refers to "Privacy Impact Assessments" to mean *both* the formal notice that must, if practicable, be published on the agency's website, in the *Federal Register*, or made publicly available by other means, *see* E-Gov. Act §§ 208 (b)(1)(B), (c), as well as the analysis that the agency conducts on an ongoing basis to ensure the continued adequacy of its IT systems.  *See* Office of Management & Budget, Circular No. A-130, Appendix II-10 ("A PIA is an analysis of how PII is handled to ensure that handling conforms to applicable privacy requirements, determine the privacy risks associated with an information system or activity, and evaluate ways to mitigate the privacy risks.  A PIA is both an analysis and a formal document detailing the process and the outcome of the analysis."), https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/OMB/circulars/a130/ a130revised.pdf; *see also* Bachman Decl. ¶ 4.

This case is only about the timing of formal written notification about the outcome of the PIA process, as Plaintiff itself makes clear.  *See* Pl.'s Prelim. Inj Mem. at 38 (claiming that its members have "sought and were denied information which the Government is required to disclose under section 208 of the E-Government Act," and basing its sole claim to informational standing

---

violation of the E-Government Act's "initiating a new collection of information" requirement, *see* Pl.'s Prelim. Inj. Mem. at 19-21, and so only that requirement is at issue in this case.

on that purported non-disclosure).  The agency must satisfy that obligation, in turn, before "initiating a new collection of information."  E-Gov. Act §§ 208(b)(1)(A)(ii), (b)(1)(B). Accordingly, unless otherwise stated, this brief's references to a "Privacy Impact Assessment" or a "PIA" refer to the formal document that must, if practicable, be published or otherwise made publicly available before the agency may collect information.[4]

### 1. The Census Bureau Has Not "Initiated a New Collection of Information."

"As in any statutory construction case, '[the court] start[s], of course, with the statutory text,' and proceed[s] from that understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'"  *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)).  Here, the statutory trigger for the E-Government Act is whether an agency is "initiating a new collection of information."  E-Gov. Act § 208(b)(1)(A)(ii).  If it is, the agency must first have conducted and, if practicable, made public a PIA.  If it is not, the agency's obligations under the Act will not have yet ripened.  Here, as Plaintiff acknowledges, the Census Bureau has not yet asked the public to respond to the 2020 Decennial Census questionnaire and, thus, has not begun "initiating a new collection of information."  The E-Government Act does not define the term "initiating," although, as Plaintiff recognizes, the common definition of "initiate" means "[c]ommence" or "start."  Pl.'s Prelim. Inj. Mem. at 19 (quoting *Kelso v. U.S. Dep't of State*, 13 F. Supp. 2d 1, 9 (D.D.C. 1998)); *see also* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/initiate ("to cause or facilitate the beginning of: set going").  "Initiating," therefore, means something akin to "starting."  The term "collection of information" is, however, specifically defined in the statute.

---

[4] The agency is, of course, complying with the E-Government Act's requirement to evaluate its IT systems on an ongoing basis.  *See* Bachman Decl. ¶¶ 6, 7, 8, 10, 15.

The E-Government Act provides that "in this title the definition under sections 3502 and 3601 of title 44, United States Code, shall apply."  E-Gov. Act. § 201.  Section 3502 of Title 44, in turn, defines "collection of information" to "mean[] the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form of format, calling for [certain quantities or types of information]."  44 U.S.C. § 3502(3)(A).  Putting these two definitions together, then, an agency must have conducted and , if practicable, published a PIA before (1) starting (2) the obtaining or soliciting of information from the public – or, said differently, before it actually starts to ask the public to submit Census information.  That has not occurred yet – nor does Plaintiff state that it has in its papers – and therefore the Census Bureau has not begun "initiating a new collection of information."

This is the best reading of the statute.  Notably, the use of the present participle terms in the definition of "collection of information" (*e.g.*, "obtaining" or "causing to be obtained"), indicates that the collection is a present-tense activity, in other words, that the collection of information occurs when the agency actually is soliciting information from the public, not merely when it is planning to collect that information in the future.  And because the verb "initiating" modifies the present tense gerunds that make up "collection of information," the statute on its face contemplates that the agency must complete its analysis and, if practicable, publish the PIA before it starts to obtain information from the public – or before it starts to mail or distribute census forms to individuals.

This reading is also consistent with how courts and other agencies have interpreted Section 208 – as a requirement to complete and, if practicable, publish a PIA before starting to solicit information from the public.  The D.C. Circuit has stated as much.  *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* ("*EPIC v. PACEI II*"), 878 F.3d 371, 378

(D.C. Cir. 2017), *cert. denied.*, No. 18-267, 2019 WL 113530 ( Jan. 7, 2019) ("As we read it, the provision [Section 208] is intended to protect *individuals* . . . by requiring an agency to fully consider their privacy *before collecting their personal information*.") (second emphasis added). Additionally, the Office of Management and Budget ("OMB"), which administers the Paperwork Reduction Act from which the E-Government Act borrows its definition section, similarly defines "collection of information" to mean "the obtaining, causing to be obtained, soliciting, or requiring the disclosure . . . of information." 5 C.F.R. § 1320.3(c). Applying a common-sense reading to this definition, the Census Bureau must complete and, if practicable, publish a PIA before it begins obtaining, soliciting, or requiring the disclosure of information from a third party; in other words, before it sends out a document requesting a Census response from a member of the public.

Plaintiff argues that the Census Bureau began "initiating a new collection of information" when the Commerce Secretary made the decision to include the citizenship question on the 2020 Decennial Census questionnaire on March 26, 2018. Pl.'s Prelim. Inj. Mem. at 20. But there is no basis in the E-Government Act's text for such a construction. Plaintiff first posits that the Census Bureau already has "commenced the 'soliciting' and 'obtaining' of citizenship status information" when the Secretary decided what questions to include. Pl.'s Prelim. Inj. Mem. at 20-21. This construction defies the language of the statute. The Census Bureau has not asked any member of the public to submit that information; indeed, as Plaintiff acknowledges, the Census Bureau has not even begun printing, addressing, or mailing census forms, and will not begin the first of these steps (printing) until June 2019. *See* Pl.'s Prelim. Inj. Mem. at 31. And, of course, the Census Bureau will not actually solicit responses to any questions until later. Plaintiff's argument, therefore, is the same as saying that a person has "commenced the soliciting" of a wedding RSVP as soon as a couple decides what information to include in the wedding invitation,

but before the invitation is even printed, much less sent.  That reading belies common sense – a person "commences the solicitation" of the wedding RSVP when they send the invitation.  So too here: the Bureau "commences the solicitation" of the response to the decennial census when it mails the form or asks the question, not when the Secretary decided what questions should be included in the questionnaire.

Next, Plaintiff notes that "an agency need not actually acquire 'facts or opinions' for the collection of information to exist, so long as the process of 'obtaining,' 'soliciting,' or 'requiring . . . disclosure' is underway."  Pl.'s Prelim. Inj. Mem. at 20 (quoting 44 U.S.C. § 3502(3)(A)).  This is true, but irrelevant.  Defendants acknowledge that an agency has begun "initiating the collection of information" once it makes the request of a member of the public, even if it has yet to receive an answer (in this context, when it mails the questionnaire but before it receives a response).  But because it has yet to ask the question, or, in the words of the statute, to start soliciting or obtaining a response, this fact is of no legal significance.

Plaintiff also contends that the obligation to complete and publish a PIA matured as of March 26, 2018 – the date "the Bureau introduced a new requirement that census respondents disclose 'facts or opinions' to 'third parties or the public.'"  Pl.'s Prelim. Inj. Mem. at 21; *see also* 44 U.S.C. § 3502(3) (defining "collection of information" to include "requiring the disclosure" of information).  But the Secretary's memorandum announcing his decision to collect citizenship information during the 2020 Decennial Census did not require *third-parties* to disclose information, it simply directed the Census Bureau to include a citizenship question on the 2020 Decennial Census questionnaire.  *See* Pl.'s Prelim. Inj. Mem. at 4.  Only once the citizenship question is asked of a respondent via a Paperwork Reduction Act-approved decennial census

questionnaire or form does the requirement to disclose information ripen.[5]  *See* 13 U.S.C. § 221(a) (individuals are required to respond to "any of the questions on any schedule submitte[d] to him in connection with any census or survey"); *see also* 44 U.S.C. § 3512(a) ("no person shall be subject to any penalty for failing to comply with a collection of information" absent that collection's approval pursuant to the Paperwork Reduction Act).

Plaintiff further states that the Census Bureau has "introduced a definite 'plan . . . calling for the collection or disclosure of information.'"  Pl.'s Prelim. Inj. Mem. at 21 (quoting 5 C.F.R. § 1320.3(c)).  This argument refers to a sub-component of OMB's Paperwork Reduction Act regulations.  Those OMB regulations note that "[a]s used in this Part," referring to Paperwork Reduction Act obligations not at issue here, "'collection of information,' refers to the act of collecting or disclosing information, to the information to be collected or disclosed, to a plan and/or an instrument calling for the collection or disclosure of information, or any of these, as appropriate."  5 C.F.R. § 1320.3(c).  (This qualification appears to refer to the fact that the Paperwork Reduction Act's regulations sometimes use "collection of information" as a verb, and sometimes as a noun to describe a package of information that must be submitted to OMB for approval, *e.g.*, 5 C.F.R. § 1320.10.)  Even this definition – which does not explicitly apply outside Paperwork Reduction Act regulations – is consistent with the government's interpretation.  The only new element that the definition provides to "collection of information" is that the term can be, in certain contexts, a "plan and/or an instrument calling for the collection or disclosure of

---

[5] As noted above, the Paperwork Reduction Act requires federal agencies seeking to collect information to first publish a notice in the *Federal Register* and allow 60 days for submission of comments.   44 U.S.C. § 3506(c)(2)(A);  *see also id.* § 3502(3) (defining "collection of information").   After considering the submitted comments, the agency must then submit its information collection request to the Director of the Office of Management and Budget for review and approval.  *See id.* § 3507(c)(3).

information."  5 C.F.R. § 1320.3(c).  But even if this definition did apply in this context, it still would not compel Plaintiff's interpretation.   At best, it would require the Census Bureau to complete the PIA before "initiating a plan and/or instrument calling for the disclosure of information."  "Initiating an instrument calling for the disclosure of information" is just another way of saying that the Bureau has posed the citizenship question to a member of the public via a questionnaire and solicited a response.  Similarly, "initiating a plan calling for the disclosure of information" is best read to refer to the Census Bureau having started to solicit information from members of the public via the implementation of its process for soliciting such responses (*i.e.*, starting the process of asking for and collecting census responses, or begun executing that solicitation plan), if, indeed, it makes sense at all in this context.

Plaintiff attempts to contort the OMB regulations to state that an agency initiates a collection of information, and therefore must publish, if practicable, a PIA, once the agency has started *planning* to collect information.  But the OMB regulations mention a "plan," not "planning."  Nor would it make sense to say that the agency must complete and, if practicable, publish a PIA *before* it has "started planning" the information collection.  Before publication of a PIA, among other things, Section 208 of the E-Government Act requires that the agency have already identified what information is to be collected, as well as why, and how it will be used, and the IT security measures that will be in place to protect such data.  *See* E-Gov. Act § 208(b)(2)(B). But this is information that can only be known – and therefore published – *during* or even at the conclusion of the planning process, not before the planning has begun.  Plaintiff's construction is thus incompatible with the structure of the statute itself.

**2.      Plaintiff is Not Likely to Show That its Claims Are Ripe or That it States a
          Claim Under the APA.**

Because the Census Bureau has not yet "initiat[ed] a new collection of information," E-

Gov. Act § 208(b)(1)(A)(ii), Plaintiff's claims are not ripe.  "The ripeness doctrine generally deals

with when a federal court can or should decide a case." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382,

386 (D.C. Cir. 2012).  "The doctrine's purpose is 'to prevent the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements over administrative

policies, and also to protect the agencies from judicial interference until an administrative decision

has been formalized and its effects felt in a concrete way by the challenging parties." *Belmont

Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 37 (D.D.C. 2012) (quoting *Abbott Labs. v. Gardner*,

387 U.S. 136, 148-49 (1967)).  Ripeness has both constitutional and prudential elements, and in

general, prudential ripeness requires that the parties "permit[] the administrative process to reach

its end," since that "can at least solidify or simplify the factual context and narrow the legal issues

at play." *Am. Petroleum Inst.*, 683 F.3d at 387; *see also id.* ("Put simply, the doctrine of prudential

ripeness ensures that Article III courts make decisions only when they have to, and then, only

once.").

Prudential ripeness has two elements – the fitness of the issue for judicial review and the

extent to which withholding a decision will cause hardship to the parties.  *See Abbott Labs.*, 387

U.S. at 149.  "The fitness requirement is primarily meant to protect 'the agency's interest in

crystallizing its policy before that policy is subjected to judicial review and the court's interests in

avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" *Am. Petroleum

Inst.*, 683 F.3d at 387 (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C.

Cir. 1999)).  In general, a matter is not fit for judicial review if the "Court could not know what

shape the final [determination] would take." *Belmont Abbey Coll.*, 878 F. Supp. 2d at 39.

Here, as discussed above, the Census Bureau is not yet required to publish, if practicable, a final PIA, and the final context of the eventual PIA - which the Census Bureau must complete before initiating the collection of information - remains inchoate.  Until that threshold is passed, this dispute is not fit for review.  Nor does "Plaintiff face[] any hardship that would outweigh the Court's interest in deferring review."  *Id.* at 41.  For this inquiry, courts "consider 'not whether the [parties] have suffered any 'direct hardship,' but whether *postponing* judicial review would impose an undue burden on them or would benefit the court.'"  *Vill. of Bensenville v. FAA*, 376 F.3d 1114, 1120 (D.C. Cir. 2004).  Plaintiff has not shown that allowing the Census Bureau to issue a PIA under the timeframe permitted by the E-Government Act would impose an undue burden on its members.  Moreover, postponing review until the Defendants have completed their PIA processes would benefit the Court by allowing it to review the Defendants' final assessment.

Nor has Plaintiff stated a claim under the APA.  It first states that it is "aggrieved by the Census Bureau's unlawful initiation of a new collection of information without first completing the required privacy impact assessments."  Pl.'s Prelim. Inj. Mem. at 24 (citing Compl. §§ 64-70).  Defendants assume this is an allegation that the Census Bureau has taken action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  But this claim is not likely to succeed for two reasons.  First, as discussed above, the Census Bureau has not acted arbitrarily, capriciously, or contrary to law; rather, it has adhered to the timing requirements set out by the E-Government Act.

Second, and relatedly, the Census Bureau's non-issuance of a final PIA with regard to the citizenship question does not constitute final agency action.  Only "final agency action," as opposed to action that is "preliminary, procedural, or intermediate," is reviewable under the APA.  5 U.S.C. § 704; *see also Trudeau v. FTC*, 456 F.3d 178, 184-85 (D.C. Cir. 2006) (final agency

action is a necessary requirement for a plaintiff to state a cause of action under the APA).  Whether

agency action is "final," in turn, is governed by the Supreme Court's decision in *Bennett v. Spear*,

520 U.S. 154 (1997).   "First, the action must mark the consummation of the agency's

decisionmaking process – it must not be of a merely tentative or interlocutory nature.  And second,

the action must be one by which rights or obligations have been determined, or from which legal

consequences will flow."  *Id.* at 177-78 (internal citations omitted).

As Plaintiff notes, the Secretary's March 26, 2018, decision to direct the Census Bureau to

include a citizenship question on the 2020 Decennial Census questionnaire constitutes final agency

action by the Commerce Department.  *See* Pl.'s Prelim. Inj. Mem. at 24-25.  But that decision is

not challenged in this case.  The decision at issue here is whether the Census Bureau has taken

final agency action *with respect to publishing a PIA for the 2020 Decennial Census questionnaire*

*including a citizenship question*.  And here, as the Census Bureau has noted, the CEN08 PIA, as

with its other PIAs, will continue to be reviewed and updated as the agency's 2020 Decennial

Census operations become more refined.[6]  *See* Bachman Decl. ¶¶ 6, 9, 15 (discussing future PIA

updates).  This process is not, therefore, final.

---

[6] Nor can Plaintiff argue that Defendants have "fail[ed] to act" within the meaning of 5 U.S.C. § 551(13).  A "failure to act" claim must still satisfy the final agency action requirement, and in the context of section 706(2), the D.C. Circuit has emphasized that the agency must have finalized a decision *not* to issue a final decision, *i.e.*, to have decided never to issue a PIA with regard to the decennial census questionnaire.  The fact that the agency has simply not yet taken action is not reviewable.   *See, e.g.*, *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987) (concluding that "EPA's failure as yet to issue a final rule" does not "reflect[] an acknowledged EPA decision to [not regulate certain strip mines]."), *partially abrogated by statute on other grounds, as reported by Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 553 n.6 (D.C. Cir. 2015); *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("[A]lthough . . . the EPA concededly made no final decision on petitioners' request that the section 115 remedial process be initiated, it *clearly and unequivocally* rejected . . . petitioners' requests for a separate proceeding[.]") (emphasis added); *see also Hazardous Waste Treatment Council v. Reilly*, 938 F.2d 1390, 1396 (D.C. Cir. 1991) (agency statements that "do not constitute a definitive position

Plaintiff also alleges a violation of section 706(1) of the APA to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004).  This provision is similar to a mandamus remedy, and requires "a specific, unequivocal command."  *Id.* at 63.  Here, however, Section 208(b) does not *unequivocally* require the Census Bureau to publish a PIA regarding the 2020 Decennial Census questionnaire at this time – at best, as discussed above, the language is ambiguous.  Nor does Section 208(b) *unequivocally* require the Census Bureau to publish a PIA regarding the 2020 Decennial Census questionnaire at all.  Section 208(b) provides agencies with discretion in making PIAs publicly available by noting that publication is required only "if practicable."  E-Gov. Act. § 208(b).

Finally, Plaintiff cannot attempt to challenge the PIA-process itself, *i.e.*, the process by which Defendants continually reexamine their IT systems.  *See* OMB Circulator A-130, *supra*.  Even if Plaintiff claimed standing for such a claim, and it does not, *see* Pl.'s Prelim. Inj. Mem. at 37-40, such a legal claim would be the "kind of broad programmatic attack" that the Supreme Court has repeatedly rejected.  *See SUWA*, 542 U.S. at 64 (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871 (1990)).  Accordingly, Plaintiff's section 706(1) claim is not likely to succeed.

One final note about Article III standing.  Although Defendants assume arguendo that, for the purposes of this motion, Plaintiff could establish it has associational standing to challenge the Defendants' alleged failure to publish a PIA consistent with the requirements of Section 208 of

. . . such that they represent a final statement of the agency's position" do not constitute final agency action).

the E-Government Act, Plaintiff's attempts to establish standing for other purposes falls short.[7]

Plaintiff asserts that the fact that it alleges it has been "adversely affected or aggrieved" is relevant

to consideration of its APA claims because, as a membership organization, it is deemed to be

"aggrieved to the same extent" as its members." *See* Pl.'s Prelim. Inj. Mem. at 24 (citing

*Pharmaceutical Research & Manufacturers of America v. Thompson*, 259 F. Supp. 2d 39, 56

(D.D.C. 2003), for the proposition that membership organizations that represent the interests of

their members have prudential standing).  But "[a] plaintiff must satisfy both the requirements of

Article III of the United States Constitution and the court-crafted doctrine of prudential standing

for his [claims] to proceed."  *Wash. Tennis & Educ. Found., Inc. v. Clark Nexsen, Inc.*, 270 F.

Supp. 3d 158, 163 (D.D.C. 2017), *reconsideration denied*, 324 F. Supp. 3d 128 (D.D.C. 2018).

Plaintiff does not contend that it has Article III standing to bring its claims on behalf of itself – it

only argues that it has Article III standing to bring its claims on behalf of its members.  *See* Pl.'s

Prelim. Inj. Mem. at 37-40.  And the D.C. Circuit has explicitly held that Plaintiff lacks Article III

standing to bring a claim predicated on Section 208 of the E-Government Act because the Act is

"directed at individual *privacy*, which is not a stake for [Plaintiff]."  *Electronic Privacy Info. Ctr.*

*v. Presidential Advisory Commission on Election Integrity* ("*EPIC v. PACEI II*"), 878 F.3d 371,

378 (D.C. Cir. 2017), *cert. denied* Case No. 18-267 (Jan. 7, 2019).  Thus any consideration of

Plaintiff's APA claims is necessarily limited to whether Plaintiff's members have been "adversely

affected or aggrieved," not whether EPIC as an organization has been so aggrieved.

---

[7] In arguing for purposes of the preliminary injunction motion that Plaintiff's claim is unlikely to succeed on the merits, Defendants do not concede that Plaintiff necessarily would be able to establish standing based on the current record.  For example, it has an obligation to show that the individual members have established that they suffer "the type of harm Congress sought to prevent by requiring disclosure," *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016), a requirement Plaintiff has not discussed, *see* Pl.'s Prelim. Inj. Mem. at 38.  This Court, however, need not resolve this issue to deny Plaintiff's motion.

Similarly, consideration of Plaintiff's allegations of irreparable injury, *see* Pl.'s Prelim. Inj. Mem. at 26-33 (alleging irreparable harm on behalf of both itself and its members), which are discussed below, is necessarily limited to the purported irreparable harm suffered by Plaintiff's members.  *See EPIC v. PACEI II*, 878 F.3d at 378.

## II.      PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM.

Plaintiff's motion for a preliminary injunction should also be denied because Plaintiff has not established that its members will likely suffer irreparable injury absent preliminary relief.  *See Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018) (holding "it is clear that the failure to show a likelihood of irreparable harms remains, standing alone, sufficient to defeat [a preliminary injunction] motion"); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit[s] such relief.").  The D.C. Circuit "has set a high standard for irreparable injury." *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) (citation omitted).  It is a "well known and indisputable principle[]" that an "unsubstantiated and speculative" harm cannot constitute "irreparable harm" sufficient to justify injunctive relief.  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

As a threshold matter, Plaintiff's claim for a preliminary injunction should fail because of its delay in seeking relief.  "Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."  *Open Top Sightseeing USA v. Mr. Sightseeing, LCC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)).

Here, Plaintiff contends that "[t]he deadline for the Census Bureau to conduct and publish the required privacy impact assessments was March 26, 2018[,]" the date the Secretary announced his decision to include a citizenship question on the 2020 Decennial Census questionnaire. Pl.'s Prelim. Inj. Mem. at 19; *see also id.* at 21, 24, Compl. ¶ 50. Plaintiff further asserts that the "irreparability of the harms" its members "suffer[] . . . increases" "[e]ach day that the Bureau fails to produce valid privacy impact assessments[.]" Pl.'s Prelim. Inj. Mem. at 33. And yet, Plaintiff did not file its Complaint until November 20, 2018 – nearly eight months after the purported "deadline for the Census Bureau to conduct and publish the required privacy impact assessments[,]" *id.* at 19. Moreover, Plaintiff waited an additional two months after filing its Complaint to seek preliminary injunctive relief. This unexplained and inexplicable delay should be fatal to Plaintiff's motion. Indeed, "[t]he D.C. Circuit has found that a delay of forty-four days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm." *Open Top Sightseeing USA*, 48 F. Supp. 3d at 90 (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)); *see also AARP v. U.S. EEOC*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) (plaintiff's "unexplained delay [of five months] in bringing this suit weights against a finding of irreparable harm"); *Biovail Corp. v. U.S. Food & Drug Admin.*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006) ("The delay in filing this suit further undermines any showing of irreparable injury"); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay of two months in bringing action "militates against a finding of irreparable harm").

Nor can Plaintiff excuse its delay by pointing to the fact that it previously conveyed its concerns to Defendants regarding the Census Bureau's purported failure to publish PIAs for the

citizenship question, beginning with its August 7, 2018, submission in response to Defendants' request, pursuant to the Paperwork Reduction Act, for comments on the proposed information collection for the 2020 Decennial Census.  *See* Pl.'s Prelim. Inj. Mem. at 12-13; *id.* at 12 (citing Dep't of Commerce, Proposed Information Collection; Comment Request; 2020 Census ("Comment Request"), 83 Fed. Reg. 26,643 (June 8, 2018)).  For starters, Plaintiff waited to submit its comments until the last day of the comment period.  *See* Comment Request, 83 Fed. Reg. 26,643, 26,643 (stating that "written comments must be submitted on or before August 7, 2018").  Further, Plaintiff's comments were submitted more than four months after the date it contends Defendants were required to publish the privacy impact assessments.  And Plaintiff's subsequent October 2018 statement to the Senate Committee on Homeland Security and Government Affairs and amicus brief in *New York v. U.S. Dep't of Commerce*, No. 18-CV-2921 (JMG) (S.D.N.Y. filed Apr. 4, 2018),[8] were submitted more than six months after the date Plaintiff contends Defendants were required to publish the privacy impact assessments.

In any event, Plaintiff has failed to demonstrate irreparable injury.  Plaintiff first asserts that its members will be irreparably harmed in the absence of preliminary relief by the non-disclosure of information that is "highly relevant to an ongoing and highly public matter" because the lack of information will hinder the ability of Plaintiff's members to "learn about, analyze, and debate the privacy implications of collecting citizenship status information through the census."  Pl.'s Prelim. Inj. Mem. at 26-27, 29.  But this type of "public debate" interest has been rejected by

---

[8]Notably, Plaintiff moved for a preliminary injunction in this case three days after the court in the Southern District of New York vacated the Secretary's decision to include a citizenship question on the 2020 decennial census.  *See New York v. Dep't of Commerce*, No. 18-CV-5025 (JMF), 2019 WL 190285, (S.D.N.Y. Jan. 15, 2019).  The injunction, although it has been appealed, *See* Not. Appeal, ECF No. 576, further undercuts the urgency of Plaintiff's request, since the citizenship question is enjoined so long as the injunction is in place.

courts within this district in the context of FOIA, and that reasoning applies here.  *See Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 32, 46-47 (D.D.C. 2014) ("It is clear from case law that a movant's general interest in being able to engage in an ongoing public debate using information that it has requested under FOIA is not sufficient to establish that irreparable harm will occur unless the movant receives immediate access to that information."); *see also Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007).  Moreover, the Census Bureau has already published information about its security practices as part of Defendants' ongoing Privacy Impact Assessment process.  Information about the citizenship question and a primary IT system slated to collect that information from 2020 Decennial Census respondents was published in the Census Bureau's June 2018 PIA for CEN08, *see* Bachman Decl. ¶ 10 & Ex. A, and the rationale and basis for the citizenship question have been discussed in the Secretary's March 26, 2018, memorandum and will be further discussed during the ongoing Paperwork Reduction Act process, *see, e.g.*, Comment Request, 83 Fed. Reg. 26,643.  The Census Bureau also will continue to update its PIAs, including the PIA for CEN08, over the coming months.  *See* Bachman Decl. ¶¶ 9, 15.  Thus, to the extent Plaintiff relies on the purported need for this information for a "public debate" purpose, much if not all of that information is already or will be available.

Furthermore, as discussed above, Defendants are not required to publish the final PIAs addressing the collection of citizenship information until before the Census Bureau begins to ask the public to complete and submit the 2020 Decennial Census questionnaire.  *See supra*.  That has not yet occurred.  Indeed, as Plaintiff acknowledges, the Census Bureau has not even begun printing, addressing, or mailing census forms, and will not begin printing until June 2019.  *See* Pl.'s Prelim. Inj. Mem. at 31.  Plaintiff's members, therefore, are "not presently entitled to the information that [Plaintiff] seeks" on their behalf.  *Electronic Privacy Info. Ctr. v. Presidential*

*Advisory Commission on Election Integrity* ("*EPIC v. PACEI I*"), 266 F. Supp. 3d 297, 319

(D.D.C. 2017), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017).  "[A]ccordingly, Plaintiff

cannot show that it[s] members ha[ve] suffered an irreparable informational injury."  *Id.*  "To hold

otherwise would mean that whenever a statute provides for potential disclosure, a party claiming

entitlement to that information in the midst of a substantial public debate would be entitled to a

finding of irreparable informational injury, which cannot be so."  *Id.*

Plaintiff next argues that its members have been irreparably injured by the Census Bureau's

failure to consider privacy "in the way that the E-Government Act mandates," specifically by

"tak[ing] privacy risks into account when reviewing its proposed collection," a harm that matures

at the time the Census Bureau was obligated to publish the final PIA for the collection of

citizenship information.  Pl.'s Prelim. Inj. Mem. at 27, 30-31 (citing *Jones v. District of Columbia

Redevelopment Land Agency*, 499 F.2d 502 (D.C. Cir. 1974)).  But this argument similarly fails,

because the Census Bureau is not yet obligated to publish, if practicable, the final privacy impact

assessments addressing the collection of citizenship information.  *See supra.*  Indeed, as explained

in the Bachman Declaration, the Census Bureau is currently in the process of updating the PIA for

a primary IT system that will be used to collect respondent information during the 2020 Decennial

Census, as well as continuing to review its other PIAs.  Bachman Decl. ¶¶ 9, 15.

Finally, Plaintiff's contention that its members "will be irreparably harmed if the Census

Bureau unlawfully acquires personal data concerning [their] citizenship status," Pl.'s Prelim. Inj.

Mem. at 32, is equally unavailing.  This argument is too speculative to support a finding of

irreparable harm because the Census Bureau is not yet required to publish, if practicable, the final

PIAs for the 2020 Decennial Census's collection of citizenship information and thus has not

violated the privacy provisions of the E-Government Act.  *See Winter*, 555 U.S. at 22 ("Our

frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."); *Wis. Gas Co.*, 758 F.2d at 674 ("movant must provide . . . proof indicating that the harm is certain to occur in the near future"). There is another fundamental problem with this claim of irreparable injury – the earliest that Plaintiff's members could demonstrate an injury is January 2020 when the Census Bureau first begins mailing or otherwise transmitting the 2020 Decennial Census questionnaire to the public. *See supra*.  Plaintiff's purported injury, therefore, is not of "such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. This remains true even if the Court were to agree with Plaintiff that its claims should be resolved before June 2019 when the Census Bureau is scheduled to begin "printing . . . [] Internet invitations, reminder cards or letters, and paper questionnaire packages[,]" Pl.'s Prelim. Inj. Mem. at 31.  *See Navajo Nation*, 292 F. Supp. 3d at 513-514 (holding plaintiff failed to show likelihood of irreparable harm where alleged harms "will not arise immediately").

## II.      THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF.

A party seeking a preliminary injunction must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

First, Plaintiff argues that these final two factors weigh in favor of issuing a preliminary injunction because it has a "uniquely strong" "informational interest" in the privacy impact assessments for the collection of citizenship information because it "is the premiere organization in the country working to enforce agencies' E-Government Act obligations . . . and [] has been a leading advocate of census privacy protections for nearly two decades." Pl.'s Prelim. Inj. Mem. at 33.  Plaintiff's "uniquely strong" "informational interest" is irrelevant.  When considering the

final two factors of the preliminary injunction analysis, courts must "pay particular regard for the *public consequences* in employing the extraordinary remedy of injunction[,]" not the interests of the plaintiff advocacy organizations. *Winter*, 555 U.S. at 24 (emphasis added). Moreover, as noted above, *see supra*, the D.C. Circuit has explicitly held that Plaintiff lacks standing itself to bring a claim under section 208 of the E-Government Act because the Act is "directed at individual *privacy*, which is not at stake for [Plaintiff]." *EPIC v. PACEI II*, 878 F.3d at 378. Plaintiff's "uniquely strong" "informational interests," therefore may not be considered.

Plaintiff's next argument that the equities also favor issuance of a preliminary injunction because it has a "strong equity in ensuring E-Government Act compliance" and that the Census Bureau has "taken no apparent measures to remedy its noncompliance" in the wake of Plaintiff's "prior warnings," Pl.'s Prelim. Inj. Mem. at 34-36, is meritless. As discussed above, Defendants are not in "noncompliance" with section 208 of the E-Government Act because Defendants have not yet begun collecting citizenship information and will not do so until January 2020, and therefore have no present obligation under the Act to publish, if practicable, the final privacy impact assessments for the 2020 Decennial Census questionnaire. *See supra*. Furthermore, as discussed previously, they are undertaking the PIA process now, in compliance with the Act.

Plaintiff also asserts that "the public interest leans heavily against the implementation of the citizenship question because . . . the question would 'be very costly, harm[] the quality of the census count, and would [result in] substantially less accurate citizenship status data than are available from administrative sources.'" Pl.'s Prelim. Inj. Mem. at 36 (citation omitted, second brackets original). But this is a claim that the citizenship question *itself* is improper on the merits; it has nothing to do with the E-Government Act provision that Defendants are alleged to have

violated in this suit.  The balance of the equities analysis should not consider such collateral challenges.

To the contrary, the public interest lies in permitting Defendants to continue to comply with the E-Government Act's requirements by completing the Privacy Impact Assessments for the 2020 Decennial Census under the process set by law.  As explained in the Bachman Declaration, Defendants anticipate that updated assessments will be made publicly available on the Department of Commerce's website on or before March 2019, well before the Census Bureau begins soliciting respondent information.  *See* Bachman Decl. ¶¶ 9, 15.

## **CONCLUSION**

For the aforementioned reasons, this Court should deny Plaintiff's Motion for a Preliminary Injunction.

Dated: January 30, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

CARLOTTA P. WELLS
Assistant Branch Director

*/s/ Joseph E. Borson*
KRISTINA A. WOLFE
JOSEPH E. BORSON (Va. Bar No. 85519)
Trial Attorney, U. S. Dept. of Justice
Civil Division, Federal Programs Branch
1100 L St., NW
Washington, D.C. 20005
Tel.     (202) 514-1944
Joseph.Borson@usdoj.gov