# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY INFORMATION CENTER,

    *Plaintiff*,

v.

U.S. DEPARTMENT OF COMMERCE, *et al.*,

    *Defendants.*

No. 18-cv-2711 (DLF)

## MEMORANDUM OPINION

Plaintiff Electronic Privacy Information Center (EPIC), a non-profit organization dedicated to privacy and civil liberties issues, brings this action against the U.S. Department of Commerce and the U.S. Census Bureau under the Administrative Procedure Act (APA) and the Declaratory Judgment Act. The plaintiff claims that the E-Government Act requires the defendants to conduct and release "privacy impact assessments" addressing Secretary of Commerce Wilbur Ross's March 26, 2018 decision to include a citizenship question in the 2020 Census. The defendants agree, but insist they still have plenty of time to do so "before" actually "initiating a new collection of information" within the meaning of the E-Government Act.[1] Before the Court is the plaintiff's Motion for a Preliminary Injunction, Dkt. 8, seeking to enjoin Commerce and the Bureau from implementing Secretary Ross's decision to add a citizenship question to the Census, *see* Dkt. 8-2. For the following reasons, the Court will deny the motion.

---

[1] E-Government Act of 2002, § 208(b)(1)(A), Pub. L. 107-347, 116 Stat. 2899 (2002), *codified at* 44 U.S.C.A. § 3501 note (hereinafter "E-Government Act").

## I. BACKGROUND

### A. Statutory Background

The E-Government Act requires federal agencies to "conduct a privacy impact assessment," "ensure the review of the privacy impact assessment," and, "if practicable, . . . make the privacy impact assessment publicly available" "before" "initiating a new collection of information" that "will be collected, maintained or disseminated using information technology" and that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to[] . . . 10 or more persons." E-Government Act § 208(b)(1)(A)–(B).

The term "collection of information" is defined by statute as "the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions . . . regardless of form or format, calling for" "answers to identical questions posed to . . . ten or more persons[.]" 44 U.S.C. § 3502(3)(A); *see also* E-Government Act § 201 (incorporating § 3502 definitions by reference). The same term is also used in OMB regulations to "refer[] to the act of collecting or disclosing information, to the information to be collected or disclosed, to a plan and/or an instrument calling for the collection or disclosure of information, or any of these, as appropriate." 5 C.F.R. § 1320.3(c). The term "initiating" has no statutory or regulatory definition.

A privacy impact assessment—or "PIA"—must "address" "what information is to be collected;" "why the information is being collected;" "the intended use of the agency of the information;" "with whom the information will be shared;" "what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared;" "how the information will be secured;" and "whether a system of records is being created under [the Privacy Act]." E-Government Act § 208(b)(2)(B)(ii).

2

B.  **Factual Background**

On March 26, 2018, Secretary of Commerce Wilbur Ross announced his decision to include a citizenship question on the 2020 Decennial Census questionnaire. *See* Bachman Decl. ¶ 12, Dkt. 12-1. That decision has been challenged elsewhere on a number of grounds.[2] For present purposes, all that matters is whether—and, more importantly, *when*—the decision to collect citizenship information had to be addressed in one or more PIAs.

The Bureau is no stranger to PIAs. When Secretary Ross announced the inclusion of the citizenship question in March 2018, the Bureau was already planning to conduct an annual PIA for the primary information technology system used for the decennial census. Bachman Decl. ¶¶ 3, 9. That system—called "CEN08"—shares Census-related information with four other systems: "CEN21," "CEN05," "CEN11," and "CEN13." *Id.* ¶ 14. And a sixth information technology system—called "CEN18"—enables the flow of information between CEN08 and the other four systems. *Id.*

The Bureau maintains and regularly updates PIAs for each of these systems. *See id.* ¶¶ 9, 15. The PIA for CEN08 was updated in June and September of 2018, and another update is in progress and scheduled for release in February or March of 2019. *Id.* ¶ 9. The PIAs for the remaining systems were all updated in June 2018 and will be reviewed and updated again "within the next two months" as part of the Bureau's annual PIA process. *Id.* ¶ 15. In the meantime, the current PIAs for these systems are available to the public online.[3]

---

[2] *See New York v. U.S. Dep't of Commerce*, No. 18-CV-2921 (JMF), 2019 WL 190285 (S.D.N.Y. Jan. 15, 2019).

[3] http://www.osec.doc.gov/opog/privacy/Census-pias.html?#.

The existing PIAs say little about the collection of citizenship information in particular. The PIAs for CEN05,[4] CEN13,[5] and CEN18[6] do not mention citizenship at all. And the PIAs for CEN08[7] and CEN11[8] mention citizenship only once, in a field labeled "Other general personal data (specify)," without any analysis or further context.[9]

Unsatisfied with this level of treatment, EPIC filed this action on November 20, 2018. The complaint asserts two counts under the APA and one count under the Declaratory Judgment Act. Count I alleges that the defendants acted unlawfully by adding the citizenship question to the Census without first conducting, reviewing, and releasing PIAs to address that decision. Compl. ¶¶ 64–70 (citing 5 U.S.C. § 706(2)(a), (c)). Count II alleges that the defendants unlawfully withheld agency action by failing to conduct, review, or release PIAs as required. *Id.* ¶¶ 71–76 (citing 5 U.S.C. § 706(1)). And Count III seeks a declaration of rights and relations consistent with counts I and II. *Id.* ¶¶ 77–78 (citing 28 U.S.C. § 2201(a)).

On January 15, 2019, a federal district court in New York permanently enjoined Commerce and the Bureau from including the citizenship question on the Census. *See New York v. U.S. Dep't of Commerce*, 2019 WL 190285, at *125. Three days later, EPIC filed this motion for a preliminary injunction, which the Court now resolves.

---

[4] http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN05_PIA_SAOP_Approved.pdf.

[5] http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN13_PIA_SAOP_Approved.pdf.

[6] http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN18_PIA_SAOP_Approved.pdf.

[7] http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN08_PIA_SAOP_Approved.pdf.

[8] http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN11_PIA_SAOP_Approved.pdf.

[9] The plaintiffs do not challenge the PIA for CEN21. *See* Compl. ¶¶ 49, 51–62, Dkt.1.

## II. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To warrant a preliminary injunction, a plaintiff "must make a clear showing" that (1) he "is likely to succeed on the merits"; (2) he "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) the "balance of equities" tips in his favor; and (4) "an injunction is in the public interest." *Id.* at 20; *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiff "bear[s] the burdens of production and persuasion" when moving for a preliminary injunction. *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).

"Before the Supreme Court's decision in *Winter*, courts weighed the preliminary injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another factor." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016). The D.C. Circuit, however, has "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring a plaintiff to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Id.* (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011)); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

"Both before and after *Winter*, however, one thing is clear: a failure to show a likelihood of success on the merits alone is sufficient to defeat the motion." *Hudson v. Am.*

5

*Fed'n of Gov't Employees*, 308 F. Supp. 3d 121, 127 (D.D.C. 2018) (citing *Ark. Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009)). "[A]bsent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review.'" *Archdiocese of Washington v. Washing Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 99 (D.D.C. 2017) (internal quotation marks omitted), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018). Accordingly, "[u]pon finding that a plaintiff has failed to show a likelihood of success on the merits, the Court may deny a motion for preliminary injunction without analyzing the remaining factors." *In re Akers*, 487 B. R. 326, 331 (D.D.C. 2012); *see also Hudson*, 308 F. Supp. 3d at 131–32 (same).

Likewise, "it is clear" before and after *Winter* "that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

The defendants concede that they must eventually prepare PIAs that adequately address the collection of citizenship data in the 2020 Census. *See, e.g.*, Defs.' Opp'n at 1, 12, Dkt. 12. But they disagree with the plaintiff that they were required to do so before Secretary Ross announced his decision to add the citizenship question on March 26, 2018. As the defendants point out, the E-Government Act requires agencies to conduct (and, if practicable, release) a PIA only before "*initiating* a new collection of information." E-Government Act § 208(b)(1)(A)(ii) (emphasis added). And "initiating" the collection of information, the defendants argue, means more than just announcing a decision to collect information at some point in the future. It requires at least one instance of obtaining, soliciting, or requiring the disclosure of information,

which in the defendants' view will not occur until the Bureau mails its first batch of Census questionnaires to the public. *See* Defs.' Opp'n at 11–14. The Court agrees.

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979); *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (same). Contemporary dictionaries define "initiate" as "[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, 'start' (a course of action, practice, etc.)." Oxford English Dictionary, http://www.oed.com/view/Entry/96066?rskey=wxG1jD&result=2&isAdvanced=false#eid; *see also* Merriam-Webster, https://www.merriam-webster.com/dictionary/initiate ("to cause or facilitate the beginning of : set going"). Black's Law Dictionary similarly defines "initiate" as to "[c]ommence, start; originate; introduce[.]" Black's Law Dictionary 784 (6th ed. 1990). These definitions share a focus on the *beginning*, *starting*, or *commencing* of a course of conduct. In the words of *Webster's Third*, they contemplate "the first actions, steps, or stages of" the activity initiated. Webster's Third New International Dictionary 1164 (3d ed. 1976)).

Combining this ordinary meaning with the statutory definition of "collection of information," an agency must conduct (and, if practicable, release) a PIA before it *begins* "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions[.]" 44 U.S.C. § 3502(3)(A). Commerce and the Bureau have not yet gone so far. While Secretary Ross decided to collect citizenship information—and announced that decision in a letter that the parties agree constitutes final agency action, *see* Pl.'s Mot. at 24–25, Dkt. 8-1; Defs.' Opp'n at 18—the defendants have yet to actually begin obtaining, soliciting, or requiring the disclosure of any citizenship data. Those actions will not occur until the Bureau

mails its first set of questionnaires to the public in January 2020. *See* Pl.'s Reply at 2, 13, Dkt. 13 (acknowledging that the questionnaires will be sent to the public in January 2020); U.S. Census Bureau, 2020 Census Operational Plan: A New Design for the 21st Century 97 (Dec. 2018), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan4.pdf (stating that the "printing, addressing, and mailing of Internet invitations, reminder cards or letters, and paper questionnaire packages" will occur between June 2019 and April 2020).

A simple hypothetical offered by the defendants illustrates why this interpretation tracks the plain meaning of the statute. Imagine a happy couple is planning a wedding, and a friend asks if they have "initiated the collection of RSVPs." Ordinarily, they would not say yes if they had merely finalized the guest list, chosen a font for the invitations, or decided to include a dinner selection on the RSVP cards. At that point, they have not "initiated the collection" of any RSVPs. They have merely made antecedent decisions about what information to collect—and from whom—in the future. Likewise, when Secretary Ross decided to add a citizenship question to the yet-to-be-mailed Census questionnaires—the equivalent of adding a dinner selection to an un-mailed RSVP card—he did not "initiate a new collection of information" but merely decided what new information the Bureau would collect later.

The plaintiff resists this analogy because Secretary Ross's decision was final and made the collection of information all but inevitable. *See* Reply at 5. For the analogy to hold, the plaintiff argues, the couple would have had to place an order with a full-service printer who will mail the invitations on a fixed date in the future unless the couple cancels the order. *Id.* But this change would not alter the couple's response because the fact that an event is certain to occur in the future does not mean it has already begun. To build on the wedding analogy, a couple does

not "initiate" their marriage by getting engaged or choosing a wedding date, even if those actions ordinarily serve as a final—and binding—decision to tie the knot. As each subsequent anniversary celebration makes clear, they will not have "initiated" their marriage until the wedding day.

A similar usage applies in the legal context. Courts routinely use the phrase "initiating an action" to refer the filing of the complaint. *See, e.g.*, *Horne v. Dep't of Agric.*, 569 U.S. 513, 520 (2013) (an agency "initiated an enforcement action" on the date the complaint was filed); *Arnold v. U.S. Secret Serv.*, 524 F. Supp. 2d 65, 66 (D.D.C. 2007) (the plaintiff "initiated this action" on the date the complaint was filed). And it would be unusual—if not downright misleading—to claim to have "initiated" a lawsuit when in fact one had merely decided which claims to allege in the complaint. That is because "initiating" normally means "beginning"—in the law as everywhere else. And there is a meaningful difference between deciding or preparing to bring a lawsuit and actually *initiating* it.

Congress must have been aware of this distinction. After all, it had a range of terms at its disposal if it wanted agencies' assessment and reporting obligations to arise earlier in the data-collection process. For instance, Congress could have required a PIA before "planning" or "providing for" a new collection of information. *See* E-Government Act (132 references to variations of the words "plan" or "provide"). Alternatively, Congress could have required a PIA whenever an agency makes a "determination" or "decision" to initiate a new collection of information. *See id.* (40 references). "The fact that [Congress] did not adopt th[ese] readily available and apparent alternative[s] strongly supports rejecting" an interpretation that would substitute them for the word Congress did choose. *Knight v. Comm'r*, 552 U.S. 181, 188 (2008).

Indeed, the only other use of "initiate" in the E-Government Act confirms that Congress uses that word deliberately to refer to actions beyond mere decisionmaking or planning. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text[.]"). Section 214(c) requires the Administrator of the Office of Electronic Government to "initiate pilot projects or report to Congress on other activities that further the goal of maximizing the utility of information technology in disaster management." E-Government Act § 214(c). Plainly, this obligation would not be satisfied if the Administrator merely announced a decision to initiate a pilot project at some point in the future. The natural interpretation of § 214(c) is that the Administrator must either actually commence a pilot project or else perform "other activities" that serve the same goals.

Although the plaintiff does not address § 214(c), it notes that elsewhere in Title 44 Congress apparently drew a distinction between "initiating," "carrying out," and "completing." *See* Pl.'s Mot. at 19 (quoting 44 U.S.C. § 3902(a)). The relevant provision states that the "Director of the Government Publishing Office shall have no authority to prevent or prohibit the Inspector General from *initiating*, *carrying out*, or *completing* any audit or investigation[.]" 44 U.S.C. § 3902(a) (emphasis added). In the plaintiff's view, this sentence proves that Congress uses "initiating" to mean something different and less than "carrying out"; thus, it must include the decision to carry out an activity in the future. The Court is unconvinced. To be sure, "[i]t is a cardinal principle of statutory construction that [a court] must give effect, if possible, to every clause and word of a statute." *NLRB. v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) (alteration adopted and internal quotation marks omitted). But it would not produce any redundancy to interpret "initiating" in § 3902(a) to refer to the actual commencement of an audit or investigation.

10

Section 3902(a) describes the beginning, middle, and end of an audit or investigation, and it makes clear that the Director cannot prevent the Inspector General from proceeding at any point in that process. If the Inspector General has not yet begun an audit or investigation, the Director cannot prevent him from "initiating" one; if he has already begun an audit or investigation, the Director cannot prevent him from "carrying [it] out"; and if he is nearing the end of an audit or investigation, the Director cannot prevent him from "completing" it. While the words "carrying out" might technically be used to describe the first or last step of an audit or investigation—just as it describes every step in between—it is more natural to refer to those steps as "initiating" and "completing" the audit or investigation. And there is nothing surprising about using the three terms together to emphasize the Inspector General's freedom from interference from beginning to end.

The plaintiff raises a number of additional arguments to support its interpretation, but none are persuasive. *First*, the plaintiff attempts to show that the text itself encompasses a decision to collect information at some point in the future. The plaintiff highlights the use of gerunds in the definition of "collection of information," *see* 44 U.S.C. § 3502(3)(A) ("obtaining," "causing," "soliciting," or "requiring"), and argues that this grammatical choice connotes "a process, not a one-off action," Pl.'s Reply at 4. But even so, the statute makes clear what that process consists of: the "obtaining" of information, the "causing" of information to be obtained, the "soliciting" of information, and the "requiring" of the disclosure of information. 44 U.S.C. § 3502(3)(A). Consequently, "initiating" a "collection of information"—even if viewed as a process—still requires the beginning of at least one of these actions.

The plaintiff also argues that Congress would not have used the six-word phrase "initiating a new collection of information" if it meant "collecting new information" and could

11

have said so directly in three fewer words. *See* Reply at 4. But this observation ignores that the noun form "collection of information" has a statutory definition that Congress may have used for clarity or consistency. Moreover, the defendants have never argued that the agency must actually "collect"—that is, obtain or receive—information to have initiated a new collection of information under § 208. They acknowledge that performing any one of the gerunds listed in 44 U.S.C. § 3502(3)(A) would qualify as "initiating" the collection of information. Thus, "soliciting" or "requiring the disclosure" of citizenship data—here, by mailing Census questionnaires—would require a PIA even if no information has been obtained in response. *See* Defs.' Opp'n at 12.

Next, the plaintiff argues that Secretary Ross literally "requir[ed] the disclosure of facts or opinions to third parties" when he issued the March 26, 2018 decision adding a citizenship question to the Census. *See* Pl.'s Reply at 7. That is simply not true. By the plaintiff's own admission, the public will not be obligated to disclose information to third-parties until the Bureau actually implements the 2020 Census. *See id.* ("[M]embers of the public will inevitably come under an obligation to disclose their citizenship status via the 2020 Census"); *id.* at 14 ("[O]nce [the Bureau] sends out the questionnaires, individuals will be legally obligated to respond.").

*Second*, EPIC attempts to draw various inferences from statutory structure. For instance, the plaintiff points to other provisions in Title 44 that describe the "collection of information" in contexts where an agency clearly has not begun obtaining or soliciting information. *See* Pl.'s Reply at 5–6 (citing, *e.g.*, 44 U.S.C. § 3505). But these provisions are both unsurprising and irrelevant because none use the critical word "initiate." Of course, an agency can "propose," "review," "approve," or "reject" a collection of information without "initiating" it, just as one

can propose or reject a marriage without initiating one. But that possibility says nothing about what it means to initiate a collection of information.

The plaintiff also highlights the provision directly adjacent to § 208(b)(1)(A)(ii), which requires a PIA before "developing or procuring information technology that collects, maintains, or disseminates information[.]" E-Government Act § 208(b)(1)(A)(i). In the plaintiff's view, the choice to require a PIA before "developing" or "procuring" technology—and not merely before "activating" or "deploying" it—shows that Congress intended PIAs to be completed early on in an agency's decisionmaking process. *See* Pl.'s Reply at 6. But one could just as easily draw the opposite inference and conclude that when Congress wants to require a PIA at a preliminary stage, like development or procurement, it does so explicitly.

*Third*, the plaintiff invokes OMB regulations that implement a related statute, the Paperwork Reduction Act, whose definitions are incorporated into the E-Government Act. *See* Pl.'s Mot. at 20; *see also* 5 C.F.R. § 1320.3 (implementing the Paperwork Reduction Act); 44 U.S.C. § 3502 (defining terms in Paperwork Reduction Act); E-Government Act § 201 (incorporating definitions in § 3502 by reference). Those regulations explain that OMB uses the term "collection of information" to refer not only to the "act of collecting or disclosing information" but also "to the information to be collected or disclosed" or to a "*plan* and/or an instrument calling for the collection or disclosure of information." 5 C.F.R. § 1320.3(c) (emphasis added). Applying this expansive regulatory definition, the plaintiff argues that Secretary Ross "introduced a definite plan . . . calling for the collection or disclosure of information" and thereby initiated a collection of information under § 208. Pl.'s Mot. at 21 (internal quotation marks omitted). Again, the Court is unpersuaded.

13

The OMB regulations define "collection of information" only "[a]s used in this Part"—that is, in the Paperwork Reduction Act regulations themselves. 5 C.F.R. § 1320.3(c). They do not purport to define the terms of the E-Government Act. This limitation is not just a technicality. Unlike § 208, the regulations implementing the Paperwork Reduction Act use the phrase "collection of information" to refer both to the act of collecting information and as a noun to describe materials submitted by an agency to OMB for approval. *See, e.g.*, *id.* § 1320.10. Given these multiple meanings, it makes sense for OMB to provide separate definitions for each. But it would be nonsensical to import these specialized, regulation-specific uses to § 208, which plainly uses "the collection of new information" to describe an event. To illustrate, it would be incoherent to speak of "initiating" "information" or "initiating" an "instrument." Yet that is the result of inserting the OMB definitions into § 208, where they were not meant to apply. And while one can "initiate" a "plan," it would be unwise to cherry-pick one component of a definition that, as a whole, was clearly designed for another purpose. Indeed, even OMB does not ordinarily invoke all three regulatory meanings of "collection of information" at once; rather, it uses the phrase to refer to "any" one of them, "as appropriate." *Id.* § 1320.3(c). Since in context, § 208 clearly refers to "the act of collecting or disclosing information," it is irrelevant that OMB sometimes uses the same phrase to refer to something else, like a "plan."

In any event, even if the OMB regulations did apply, they would not change the outcome here. To "initiate" a "plan" would still mean to commence it or put it into action, not merely to announce it, as EPIC suggests, *see* Pl.'s Mot. at 20–21. Thus, a "plan . . . calling for the collection or disclosure of information" would not be "initiated" until the "collection or disclosure" "call[ed] for" actually begins—in this case, with the mailing of questionnaires to the public.

*Fourth*, the plaintiff invokes precedent, pointing to a D.C. Circuit decision that mentioned in passing that an agency "need not prepare a privacy impact assessment unless it *plans* to collect information." *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 380 (D.C. Cir. 2017) (emphasis added). Setting aside that this quote addresses *whether* an agency must prepare a PIA—not *when*—EPIC overlooks that the same decision elsewhere describes the E-Government Act as requiring an agency to "conduct, review and, if practicable, publish a privacy impact assessment before it *collects* information." *Id.* at 375 (emphasis added and internal quotation marks omitted); *see also id.* (describing the Act as "requiring an agency to fully consider [individuals'] privacy before *collecting* their personal information" (emphasis added)). If anything, *EPIC* supports the defendants' interpretation, although the Court declines to attach significance either way to a decision that had no occasion to interpret the statutory language.

*Fifth*, the plaintiff argues that allowing agencies to wait until after deciding to collect information to conduct and publish a PIA would frustrate the purpose of the E-Government Act's privacy provisions. *See* Pl.'s Reply at 9. But "[e]ven the most formidable argument concerning the statute's purposes could not overcome the clarity" of "the statute's text." *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012). At any rate, here the statutory purpose and plain text are perfectly compatible. The E-Government Act has many purposes—eleven to be exact—and nearly all focus on improving Government efficiency, transparency, and performance through the use of the Internet and emerging technologies. *See* E-Government Act § 2(b)(1)–(11). Congress recognized, however, that this shift to "electronic Government" could create privacy concerns, and it addressed those concerns through the "Privacy Provisions" embodied in § 208. *Id.* § 208(a). Importantly, § 208 is not a general privacy law; nor is it meant to minimize the

collection of personal information. Rather, its express purpose is "to ensure sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government." *Id*. Congress's focus on ensuring "protections" when agencies "implement" electronic Government shows that § 208's provisions—including the requirement to prepare PIAs—were not meant to discourage agencies from collecting personal information but rather to ensure that they have sufficient protections in place before they do. It is no surprise, then, that Congress would require agencies to prepare PIAs only before they actually begin to gather, store, and potentially share personal information.

The plaintiff advocates a much broader conception of § 208's purpose aimed at influencing agency decisionmaking. To support that vision, it cites cases discussing the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, which requires agencies to prepare "environmental impact statements." *See* Pl.'s Reply at 9 (citing *Jones v. D.C. Redevelopment Land Agency*, 499 F.2d 502, 512 (D.C. Cir. 1974) and *Lathan v. Volpe*, 455 F.2d 1111, 1121 (9th Cir. 1971)). But the E-Government Act and NEPA are hardly analogous. Although they both require a form of "impact" assessment, the role and timing of those assessments differ sharply. Unlike the E-Government Act, NEPA explicitly requires an impact statement to be included "in every *recommendation* or *report* on *proposals* for legislation and other Federal actions" that meet certain criteria. 42 U.S.C. § 4332(C) (emphasis added). EPA regulations further specify that "[a]n agency shall commence preparation of an environmental impact statement *as close as possible* to the time the agency is *developing or is presented with a proposal*," and the statement must "be prepared *early enough* so that it can serve practically as an *important contribution to the decisionmaking process* and will not be used to rationalize or justify decisions already made." 40 C.F.R. 1502.5 (emphasis added). The regulations go on to provide specific deadlines

for preparing environmental statements depending on the type of agency action proposed. *Id.* (a)–(d). This language—explicitly tying impact statements to agency decisionmaking and imposing clear and specific deadlines as early as possible in the decisionmaking process—is notably absent from the E-Government Act, which requires only that agencies conduct and, if practicable, release a privacy impact assessment before "initiating the new collection of information" and only then for the purpose of "ensuring sufficient protections" for the information collected.

That is not to say that negative policy consequences cannot ever result if an agency drags its feet in performing its PIA obligations. *See* Pl.'s Reply at 3. But publishing a PIA shortly before commencing a new collection of information does not make the PIA "useless," as EPIC claims. *See id.* Indeed, publishing a PIA even belatedly would support one of the purposes of the E-Government Act to "make the Federal Government more transparent and accountable," E-Government Act § 2(b)(9), and would inform citizens why their data is being collected, how it is secured, and with whom it will be shared. *See id.* § 208(b)(2)(B)(ii).

For all of these reasons, the Court interprets "initiating a new collection of information," E-Government Act § 208(b)(1)(A)(ii), to require at least one instance of "obtaining, causing to be obtained, soliciting, or requiring the disclosure . . . of facts or opinions," 44 U.S.C. § 3502(3)(A). This interpretation is fatal to the plaintiff's APA claims. The Bureau did not act contrary to the E-Government Act by deciding to collect citizenship data before conducting, reviewing, or releasing a PIA addressing that decision. *See* 5 U.S.C. § 706(2). Nor have the defendants "unlawfully withheld" agency action by declining to conduct or release a PIA earlier

than they were required to under the statute. *See id.* § 706(1). EPIC is therefore unlikely to succeed on the merits.[10]

### B. Likelihood of Irreparable Harm

"Having concluded that plaintiff has no likelihood of success on the merits, the Court finds it unnecessary to weight the remaining preliminary injunction factors." *Doe v. Hammond*, 502 F. Supp. 2d 94, 102 (D.D.C. 2007). Nonetheless, the Court will briefly address the plaintiff's three theories of irreparable harm—none of which are persuasive.

First, the plaintiff argues that the Bureau's ongoing failure to publish adequate PIAs irreparably harms its members by denying them information vital to a national debate. Pl.'s Mot. at 27. But even assuming this harm is irreparable, it will not be redressed by the relief requested. The plaintiff does not seek an affirmative injunction directing the defendants to perform or publish a PIA. It seeks only negative injunctions preventing the Bureau from "implementing" Secretary Ross's "decision to add a citizenship question to the 2020 Census" and from "initiating any collection of citizenship status information that would be obtained through the 2020 Census." Pl.'s Proposed Order, Dkt. 8-2. As the D.C. Circuit has explained, "halting" the "collection of . . . data" cannot redress an informational injury under the E-Government Act because "ordering the defendants *not* to collect . . . data only *negates* the need (if any) to prepare an impact assessment, making it *less* likely that EPIC will obtain the information it says is

---

[10] The defendants argue that this interpretation of § 208 also leads to certain prudential and jurisdictional consequences—namely, a lack of ripeness or final agency action. *See* Defs.' Opp'n at 16–21. But these arguments would only be relevant if EPIC sought to challenge, prospectively, the agencies' failure to conduct or release adequate PIAs in the future. It does not. *See* Pl.'s Reply at 13. EPIC challenges only the defendants' past failure to conduct or release adequate PIAs before Secretary Ross issued his decision on March 26, 2018. *See, e.g.*, Pl.'s Reply at 10–13; Compl. ¶¶ 64–76. The Court therefore need not consider whether a different claim premised on future acts or omissions could proceed.

essential." *EPIC*, 878 F.3d at 380 (emphasis in original). Because the purported deprivation of information is not redressable through the relief requested, the Court cannot rely on it to establish irreparable harm.

Second, the plaintiff argues that its members suffered irreparable harm from Secretary Ross's failure to conduct a PIA and take privacy considerations into account before deciding to collect citizenship data. *See* Pl.'s Mot. at 29–31. The plaintiff acknowledges that this harm has already "mature[d]", *id.* at 30 (internal quotation marks omitted), and that the defendants will not change course absent judicial intervention, *see* Pl.'s Reply at 5, 7, but it nonetheless argues that "equitable intervention is necessary" before an "irretrievable commitment of resources" occurs that might render any future PIA a rubber stamp, *id.* at 15 (internal quotation marks omitted). The problem, however, is that the earliest "irretrievable commitment" the plaintiff identifies is the "printing, addressing, and mailing" of Census materials in June 2019. Pl.'s Mot. at 30 (internal quotation marks omitted). That event, still four months away, is not "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm," *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (internal quotation marks omitted), particularly in an APA suit where summary judgment typically "serves as the mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review," *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Given the possibility of resolving this suit on the merits through expedited summary judgment briefing, the plaintiff has not shown a present need for equitable relief to maintain the status quo. Further, another court has already permanently enjoined the Bureau from implementing the Census with a citizenship question. *See New York v. U.S. Dep't of Commerce*, 2019 WL 190285, at *125. Thus, the prospect of printing and mailing questionnaires that include the citizenship question is

19

far from "certain," *Wisconsin Gas Co.*, 758 F.2d at 674, and will only occur if the Bureau successfully challenges the injunction on appeal.

Finally, the plaintiff argues that its members will be irreparably harmed if and when their own citizenship data is collected. But this harm, too, is neither imminent nor certain. The parties agree that the Bureau will not mail any questionnaires until January 2020 at the earliest. Pl.'s Reply at 2, 14; Defs.' Opp'n at 26–27. And, again, even that will only happen if the permanent injunction already in effect is vacated or reversed on appeal.

In short, the plaintiff has not demonstrated a "certain" injury "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wisconsin Gas Co.*, 758 F.2d at 674 (emphasis and internal quotation marks omitted). That failure alone, like the failure to show a likelihood of success on the merits, provides an independent ground for denying its motion. *Navajo Nation*, 292 F. Supp. 3d at 512.

## CONCLUSION

For the foregoing reasons, the Court will deny the plaintiff's motion for a preliminary injunction. A separate order accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

February 8, 2019